United States Court of Appeals
Fifth Circuit

**F I L E D**

June 4, 2004

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

No. 02-60524

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellant,**

**versus**

**JAMES EDWARD FRYE,
also known as Sealed Defendant 2,**

**Defendant-Appellee.**

**Appeal from the United States District Court
for the Southern District of Mississippi**

Before DUHÉ, BARKSDALE, and DENNIS, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

The Government's interlocutory appeal presents two points: our jurisdiction; and the district court's ruling that the Government may not seek the death penalty against James Frye, pursuant to finding that, by misrepresenting it would not seek the penalty, the Government violated Frye's Sixth Amendment right to a speedy trial.

We have jurisdiction. And, because there has not been a speedy trial violation, we need not address the proper remedy. **VACATED and REMANDED.**[*]

---

[*] The Government's 10 February 2003 motion to supplement the record on appeal is **GRANTED** for the 21 September 2001 status conference minute entry and the 1 October 2001 continuance order;

Indicted in February 2001, Frye and Cooper were charged, *inter alia*, with the death-eligible offense of carjacking resulting in death, in violation of 18 U.S.C. § 2119(3). Trial was set for that May. Because of an April 2001 superseding indictment, it was re-set for August.

By an unopposed motion in early August, the Government was granted a continuance until October because Cooper was undergoing a competency examination that would not be completed until after the August setting. The order stated: "to deny the Motion would deny both defendants and the United States adequate time to prepare for trial and attend to pretrial matters necessitated by [Cooper's competency] examination"; "the ends of justice outweigh the right of defendants and the public to a speedy trial"; and "the defendants, by agreeing, have waived their rights to a speedy trial".

On 26 October 2001, the district court set a 15 January 2002 deadline for the Government to file its notice of intent to seek the death penalty against Frye, Cooper, or both. Four days later, on the joint motion of Frye and the Government, trial was re-set for 25 February 2002; the order stated that the continuance had been requested "on grounds all counsel need additional time to

---

it is **DENIED** for the remainder (three letters and an evaluation form that are *not* part of the record in district court).

adequately prepare for trial" and referenced Frye's waiver of his rights under the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.*

Two weeks later (15 November), the United States Attorney for the Southern District of Mississippi requested permission from the Attorney General to seek the death penalty for Frye and Cooper; a meeting for that purpose was held at the Department of Justice (DOJ) on 10 December 2001. Cooper's counsel attended; Frye's participated by telephone (following video conference equipment malfunction).

That same day (10 December), Frye's counsel, by motion unrelated to the death penalty, stated that, if the Government elected to seek that penalty for Frye, it would be contrary to prior representations by the Assistant United States Attorney (AUSA) prosecuting the case; that, as Frye's counsel had "previously announced to this Court in a Status Conference, the expectation of the Government [and] counsel with regard to this case is that it would not be tried as a death penalty case".

A week later, this claim was repeated in more detail by motion, addressed the next day at a hearing. Frye's counsel stated: although they had originally begun planning to defend against the death penalty, the AUSA had assured them the Government would not seek that penalty; accordingly, Frye's counsel had not prepared for that defense. Concerning the AUSA's advising that seeking the penalty had been recommended to the Attorney General at

3

the 10 December meeting, the court's position was that it had "understood at [a] status conference that ... [the AUSA was] trying to negotiate with Frye for a plea in exchange for his testimony as to Cooper and on that basis that you were not going to seek the death penalty against Mr. Frye".

On 15 January 2002, consistent with the deadline set by the 26 October order, the Government filed its notice of intent to seek the death penalty for Cooper and Frye. The next day, the district court severed their trials. (Not long thereafter, Cooper was tried and found guilty, but the death penalty was not imposed; his conviction was affirmed. *United States v. Cooper*, 71 Fed. Appx. 298 (5th Cir. 2003) (unpublished), *cert. petition filed*, No. 03-8805 (8 October 2003).)

On 7 February 2002, Frye filed two motions: to dismiss due to speedy trial violations; and to preclude the death penalty due to prosecutorial misconduct. Ultimately, Frye's trial was continued to late July 2002.

By a comprehensive 20 May 2002 opinion and order, the motion to dismiss was granted in part. That motion requested the court to "dismiss the charges" against Frye. The district court understood the motion as incorporating two requests: "that [for speedy trial violations] the death penalty and/or the indictment should be dismissed".

The court found:  post-superseding indictment in April 2001, trial had been set for 7 August 2001; because the AUSA represented to the court and Frye's counsel that the Government did not intend to seek the death penalty for Frye, the court had not required the Government to respond to Frye's numerous motions filed between 30 May and 12 July 2001; and, based on Frye's understanding that the Government was not seeking that penalty, Frye had joined motions to continue and waived his right to a speedy trial.

Based on these findings, the court found that, under the four-factor analysis of *Barker v. Wingo*, 407 U.S. 514 (1972), Frye's Sixth Amendment speedy trial right had been violated.  It recognized Frye's waivers of the right, but found them only partly valid.  Because Frye's counsel represented that the waivers had been made on the basis of the Government's death penalty representations, the court found the waivers valid "with regard to the substantive statutory violations as charged" but not valid "with regard to the death penalty phase".  The court, considering the death penalty sentencing hearing prescribed by 18 U.S.C. § 3593, found "allowing such a hearing to proceed would violate [Frye's] right to a [speedy] trial under the Sixth Amendment".  Accordingly, it granted the motion to dismiss "insofar as the Government may not seek the death penalty in this case".  (Hereinafter, "dismiss the death penalty" and "the dismissal" refer to this relief.)  Concerning the other requested relief, the court

5

denied the motion, based on claimed prosecutorial misconduct, to preclude the death penalty; denied, as moot, an unrelated motion to dismiss the death penalty; and denied or declined to reach all other requested relief. Among the claims not considered were: violation of the Speedy Trial Act; preclusion of the death penalty because of prosecutorial misconduct; and ineffective assistance of counsel because they relied on the AUSA's representations (this claim was ruled premature).

In mid-June 2002, the United States filed a notice of appeal from the dismissal; Frye cross-appealed shortly thereafter. (Although the record does not reveal the issues Frye wanted to raise by his appeal, he later claimed in his motion in our court seeking to dismiss the Government's appeal that one issue was the entire indictment's not being dismissed on Sixth Amendment speedy trial grounds.) On 29 July, the district court stayed proceedings pending appeal. At the hearing on the Government's stay-motion: Frye's counsel opposed a stay and requested a speedy trial; the court announced that, if the dismissal were reversed, on remand it would grant a continuance that might be requested by Frye; and his counsel stated that, during the pendency of this appeal, they would continue to prepare for a death penalty trial.

In April 2003 (after the Government's opening brief had been filed here), pursuant to Frye's motion and in order to develop the record on the facts underlying the dismissal, our court remanded this case to district court "to reconstruct status conferences and

6

for transmission of that reconstruction to this court to be included on appeal". That June, the district court held a hearing for that purpose.

## II.

Before we can address the dismissal, we must address our jurisdiction.

## A.

In October 2002, on motion by the Government, a motions panel for our court dismissed Frye's cross-appeal for lack of jurisdiction and denied Frye's motion to dismiss this appeal for that same reason. That December, however, the Government filed a notice with our court, presenting the question of our jurisdiction. Although maintaining we have jurisdiction, the Government requested that, if it is lacking, we remand to enable the Government to remedy the jurisdictional defect. (The motions panel carried that matter with the case for disposition by this panel in ruling on the merits. Obviously, the alternative request to remand is rendered moot by our holding that we have jurisdiction.)

Government appeals in criminal cases are addressed in 18 U.S.C. § 3731; it enumerates categories of actions from which the Government may appeal. One category includes any "decision, judgment, or order of a district court dismissing an indictment ... or granting a new trial after verdict or judgment, as to any one or more counts, or any part thereof, except that no appeal shall lie where the double jeopardy clause of the United States Constitution

7

prohibits further prosecution". (The "or any part thereof" phrase was added on 2 November 2002, subsequent to both the Government's notice of appeal and denial of Frye's motion to dismiss but prior to the Government's jurisdictional notice. 21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 107-273, § 3004, 116 Stat. 1758, 1805 (2002). Neither side has briefed this addition. In any event, it does not alter our having jurisdiction, discussed *infra*. If anything, it is further support for it.)

Section 3731 does not specifically provide for appeals from orders, as in this case, that there would be no death penalty sentencing hearing. On the other hand, it concludes: "The provisions of this section shall be liberally construed to effectuate its purposes".

Before turning to quite recent precedent, it is helpful to review the development of Government appeals in death penalty cases. *United States v. Woolard*, 981 F.2d 756 (5th Cir. 1993), considering our jurisdiction to review an order striking the death penalty, held: the order "effectively removed a discrete basis of liability", *id*. at 757; and, because this had the practical effect of a dismissal of an indictment (an order enumerated in § 3731), our court had jurisdiction, *id*. The Government's December 2002 notice, however, raises a question of *Woolard*'s application here.

In that notice, the Government notes — but does not adopt — the position that *Ring v. Arizona*, 536 U.S. 584 (2002), and *United*

8

*States v. Cotton*, 535 U.S. 625 (2002), require an indictment authorizing the death penalty to allege mental state and aggravating factors. According to the Government, Frye's indictment did not allege the aggravating factors. *See* 18 U.S.C. § 3592(c) (listing aggravating factors for homicide, including death during commission of another crime, as charged in Frye's indictment for the carjacking count). Therefore, according to this position, if aggravating factors must be alleged in order for the death penalty to be authorized, then dismissing that penalty here would *not* effectively dismiss a portion of Frye's indictment. (In its notice, the Government urges several bases for jurisdiction in addition to § 3731.)

Some courts have accepted this position, *see United States v. Allen*, 357 F.3d 745 (8th Cir. 2004), *vacated and reh'g granted*, 11 May 2004. On the other hand, both sides recognize that our court earlier stated: "*Ring* did not hold that indictments in capital cases must allege aggravating and mental state factors". *United States v. Bernard*, 299 F.3d 467, 488 (5th Cir. 2002), *cert. denied*, 539 U.S. 928 (2003). In *Bernard*, however, the claim that an indictment must allege such factors was reviewed only for plain error; arguably, the above quotation is *dictum*.

In any event, our very recent decision in *United States v. Robinson*, No. 02-10717, 2004 WL 790307 (5th Cir. 14 Apr. 2004), makes reliance on *Woolard* inapposite. In *Robinson* (in which the

9

Government conceded that the factors must be alleged in a death penalty indictment, *id*. at *2), we held:  "[T]he government is required to charge, by indictment, the statutory aggravating factors it intends to prove to render a defendant eligible for the death penalty".  *Id*. at *3.  Because Frye's indictment did not allege the factors, the order of the district court may not have had the practical effect of dismissing a portion of an indictment. Therefore, we do not decide appealability on the basis of *Woolard*'s reading of orders enumerated in § 3731.

Instead, we have jurisdiction because § 3731 has been construed to be broader than the list it enumerates.  In reviewing the history of government appeals in criminal cases, *United States v. Wilson*, 420 U.S. 332 (1975), held:  in enacting § 3731, "Congress intended to remove all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit".  *Id*. at 337; *see*  18 U.S.C. § 3731 (as quoted earlier, authorizes appeals from a "decision ... dismissing an indictment ... except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution"); *United States v. Duncan*, 164 F.3d 239, 241-42 (5th Cir. 1999).  Therefore, our jurisdiction does not depend upon fitting the dismissal into one of § 3731's categories.

Again, the relevant constitutional limitation is the double jeopardy clause.  *See* *Wilson*, 420 U.S. at 338-39; 18 U.S.C. § 3731

10

(barring appeals where prohibited by the double jeopardy clause). A jury has not been empaneled and sworn; therefore, jeopardy has not attached. *See* **United States v. Mann**, 61 F.3d 326, 330 (5th Cir. 1995), *cert. denied*, 516 U.S. 971, 1094, 1118 (1996). There can be no double jeopardy concern. **Id**. As a result, the Constitution is not violated by this appeal from the order dismissing the death penalty; we have jurisdiction. *See* **United States v. Quinones**, 313 F.3d 49, 57 (2d Cir. 2002) (citing cases), *cert. denied*, 124 S. Ct. 807 (2003).

B.

The Sixth Amendment affords Frye "the right to a speedy ... trial". U.S. CONST. amend. VI. At issue is that Sixth Amendment right, not the Speedy Trial Act, 18 U.S.C. § 3161. "[A] claim under the Speedy Trial Act differs in some significant ways from a claim under the sixth amendment speedy trial clause". **United States v. Mehrmanesh**, 652 F.2d 766, 769 (9th Cir. 1981). **Barker** did not prescribe specific speedy trial rules for federal prosecutions; Congress did so with the subsequent Speedy Trial Act, which was meant to guarantee a trial at least as timely as that guaranteed by the Sixth Amendment. *See* 18 U.S.C. § 3173 ("No provision of this chapter shall be interpreted as a bar to any claim of denial of speedy trial as required by amendment VI of the Constitution.").

11

In dismissing the death penalty, the district court found: the AUSA misrepresented that the Government was not going to seek it for Frye; and this invalidated Frye's speedy-trial-right waiver. The misrepresentation found by the district court must be considered in determining whether there was a Sixth Amendment speedy trial violation. (Needless to say, our holding that there was none does *not* alter the district court's findings and concerns about the not-seeking-death-penalty representations.)

Determining whether the Sixth Amendment speedy trial right has been violated involves evaluating and balancing the earlier referenced four factors identified in **Barker**; they are: "(1) the length of the delay, (2) the reason for [it], (3) the defendant's diligence in asserting his Sixth Amendment right, and (4) prejudice to the defendant resulting from the delay". **United States v. Cardona**, 302 F.3d 494, 496 (5th Cir. 2002) (citing **Barker**).

1.

Findings of fact made for Sixth Amendment speedy trial analysis are, of course, reviewed only for clear error. **United States v. Serna-Villarreal**, 352 F.3d 225, 230 (5th Cir. 2003), *cert. denied*, 124 S. Ct. 1896 (2004). Under that well-known standard, "we defer to the findings of the district court unless we are left with a definite and firm conviction that a mistake has been committed". **Payne v. United States**, 289 F.3d 377, 381 (5th Cir. 2002).

12

The parties dispute our standard of review, however, for the four-factors balancing.  The Government maintains we review *de novo*; but, it acknowledges our precedent can be read otherwise. *E.g., **Davis v. Puckett***, 857 F.2d 1035, 1040-41 (5th Cir. 1988) ("In *evaluating the factors*, the district court *was not clearly erroneous in deciding* that Davis's constitutional right to a speedy trial had not been violated." (emphasis added); "Having run the ***Barker*** balancing test, we conclude that the district court *did not clearly err in determining that Davis failed to show that his Sixth Amendment rights were violated*." (emphasis added)); ***United States v. Bergfeld***, 280 F.3d 486, 492 n.* (5th Cir. 2002) (Garwood, J., dissenting in part) ("We review the district court's *application* of the relevant [speedy trial] factors for *clear error*." (emphasis added; citing ***United States v. Lucien***, 61 F.3d 366, 371 (5th Cir. 1995)).  The Government asserts that these statements are best read as referring only to the fact finding used for the ultimate balancing decision; Frye, that we utilize the more deferential clearly erroneous standard for that decision.

The earlier cases stated, without providing reasons, that they were reviewing for clear error the district court's decision on whether the Sixth Amendment speedy trial right had been violated. ***Davis***, quoted above, cited no authority in support of this standard of review.  ***Davis*** was cited in ***Robinson v. Whitley***, 2 F.3d 562, 568

13

(5th Cir. 1993), *cert. denied*, 510 U.S. 1167 (1994), in support of the conclusion that the district court's "overall evaluation" of the speedy trial issue was not "clearly erroneous". **Robinson** was cited by the **Bergfeld** majority in support of the clear error standard of review for a district court's "findings in applying the elements of this balancing test". 280 F.3d at 488. And, **Bergfeld** was cited recently in **Serna-Villarreal**, 352 F.3d at 230, to support reviewing only for clear error "a district court's findings in applying the elements of this [**Barker**] balancing test". None of the more recent cases which state that the district court's fact findings are reviewed for clear error state the standard of review for the balancing itself.

Against this background, we note that, generally, a district court's balancing of factors, resulting in a decision, are akin to, if not, conclusions of law, or at least rulings on mixed questions of fact and law, reviewed *de novo*. *E.g., **United States v. Soape***, 169 F.3d 257, 267 (5th Cir.) (claim that denial of subpoena requests violated Sixth Amendment right to compulsory process reviewed *de novo*), *cert. denied*, 527 U.S. 1011 (1999). Accordingly, it is arguable that plenary review should be given a Sixth Amendment speedy trial decision. On the other hand, because that decision is so fact specific, the clear error standard may well fit the bill. We need not now resolve this question. Even

14

assuming we review only for clear error, we reach the same result: Frye's Sixth Amendment speedy trial right was not violated.

2.

*Barker* explained that this Sixth Amendment right protected three interests: "prevent oppressive pretrial incarceration"; "minimize [accused's] anxiety"; and "limit the possibility [of his] defense [being] impaired". 407 U.S. at 532. Prejudice *vel non*, the last of the four factors used for balancing and deciding whether that right has been violated, is to be evaluated in the light of these interests. *Id*. Again, those four factors are: delay-length; reason for it; diligence in asserting right; and prejudice from delay.

The *Barker*-analysis is undertaken *only* if delay-length is sufficient to make it presumptively prejudicial. *Doggett v. United States*, 505 U.S. 647 (1992), explained that this delay-length factor serves initially to determine whether a full *Barker*-analysis is required. "Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay...." *Id*. at 651-52. Once that threshold has been crossed, delay-length is balanced with the other *Barker* factors. Delay-length plays an important role in the balancing because, obviously, "the presumption that pretrial delay has prejudiced the accused intensifies over time". *Id*. at 652.

15

If a court undertakes a full *Barker*-analysis, it evaluates the first three factors (delay-length; reason for it; diligence in asserting right) in order to determine whether prejudice will be presumed or whether actual prejudice must be shown. *Serna-Villarreal*, 352 F.3d at 231; *Bergfeld*, 280 F.3d at 488. (If prejudice is presumed, the Government can overcome that by "show[ing] that the presumption is extenuated ... or rebut[ting] the presumption with evidence". *Serna-Villarreal*, 352 F.3d at 231.) Courts "weigh the first three *Barker* factors ... against any prejudice suffered by the defendant due to the delay in prosecution". *Id*. at 230. In all of this, courts do *not* engage in a rigid analysis, but engage in the "functional analysis of the right in the particular context of the case". *Barker*, 407 U.S. at 522.

### a.

In its 20 May 2002 dismissal order, the district court found: for speedy trial purposes, events would be measured from the date of the indictment (23 February 2001) by which Frye was first charged with the death-eligible offense; ultimately, trial was set for 22 July 2002; and, therefore, there was a 17-month delay from indictment to anticipated trial. The court found this long enough to be considered presumptively prejudicial, requiring a full *Barker*-analysis.

16

The Government challenges this conclusion because the court included the five and one-half month period between Frye's two February 2002 motions (to dismiss and to preclude) and the setting that July. Absent that period, according to the Government, the delay-length is only 11½ months, negating the need for a full *Barker*-analysis. *See **Knox v. Johnson***, 224 F.3d 470, 477 (5th Cir. 2000) ("delay of less than one year will rarely qualify as 'presumptively prejudicial'") (quoting ***Cowart v. Hargett***, 16 F.3d 642, 646 (5th Cir. 1994)), *cert. denied*, 532 U.S. 975 (2001). The Government claims the district court could have set trial at any point after receiving the February 2002 motions.

In considering this position, we note that, as for other speedy trial claims, it would be easier post-trial to evaluate the merits of the claim. "As is reflected in the decisions of [the Supreme] Court, most speedy trial claims, therefore, are best considered only after the relevant facts have been developed at trial." ***United States v. MacDonald***, 435 U.S. 850, 858 (1978). Again, the July 2002 trial date was only anticipated.

In any event, there is no basis to use an end-point other than that setting. Apart from the practical difficulty the district court would have had in promptly setting trial after the February 2002 motions, there was no such request by the Government. "A defendant has no duty to bring himself to trial; the [Government] has that duty ...." ***Barker***, 407 U.S. at 527 (footnote omitted).

17

On these facts, the period of time between the February motions and July setting will not be excluded from the delay-length consideration.

The delay was longer than our one-year guideline. Therefore, the district court properly undertook a full *Barker*-analysis.

b.

For the following reasons, prejudice will not be presumed. Accordingly, Frye must show actual prejudice.

(1)

The first of the factors is delay-length. The delay resulting from this appeal is not included in this analysis. *See **United States v. Loud Hawk***, 474 U.S. 302, 315 (1986) ("an interlocutory appeal by the Government ordinarily is a valid reason that justifies delay"). Some of that time was consumed by our remand, *at Frye's request*, to the district court for the supplement-the-record hearing he requested. Moreover, he cross-appealed; but for its dismissal, he would have had us consider his appeal.

Obviously, when evaluating delay-length, courts must consider the complexity of, and facts for, each case. **Barker**, 407 U.S. at 530-31. The period between indictment and the Government's notice of appeal (late February 2001 to late June 2002) is approximately 16 months. Although long enough to prompt a full **Barker**-analysis, it is not long enough to weigh heavily in favor of presuming prejudice. "Indeed, [our] Court and others generally have found

18

presumed prejudice only in cases in which the post-indictment delay lasted at least five years." *Serna-Villarreal*, 352 F.3d at 232 (citing cases). The facts at hand provide no reason to depart from that guideline. For example, for a significant part of the period (until mid-January 2002), Frye's trial was joined with Cooper's, who faced the death penalty.

(2)

The reason for the delay is the second of the factors evaluated in determining whether prejudice is presumed. "A deliberate attempt to delay the trial in order to *hamper the defense* should be weighted heavily against the government." *Barker*, 407 U.S. at 531 (emphasis added). In this regard, the district court found: the primary "reasons for the delay were the Orders granting continuances"; they were granted because of Frye's agreement and waiver of rights; and "Frye and the Court were misled into granting the continuances based on the repeated representations by the Government that it was not recommending the death penalty".

The district court found that the misrepresentations were the kind of "deliberate attempt to delay the trial in order to hamper the defense", including intentionally to delay to gain a tactical advantage or harass, that concerned the **Barker** Court. It based this in part on three additional findings: the misrepresentations had helped the Government and hurt Frye because the Government

19

continued to gather evidence to be used both at the DOJ meeting (to determine whether death penalty would be sought) and at trial; it did not provide Frye with required discovery materials; and Frye *claimed* he had refrained from appealing discovery rulings by the magistrate judge.

The Government contends that these findings are clearly erroneous. But, they were based, in part, on the court's recollection of events and of its reasons for granting the continuances; pursuant to our review of the record, they are *not* clearly erroneous. The Government is correct, however, that these findings do not equate with the kind of willful hampering of the defense condemned in **Barker**.

The first fact from which the district court concluded that this factor weighed against the Government was that the Government used the time further to investigate. While a delay to permit the Government further to investigate the case is likely to harm a defendant (and, in that sense, likely to hamper the defense), reasonable investigative delay is not the kind of delay with which the **Barker** Court was concerned. *See* **Doggett**, 505 U.S. at 656. The Barker Court was concerned with the Government's delaying in order to obtain an "*impermissible* advantage at trial". **Id**. (emphasis added). Under these facts, the two continuances obtained within one year of the indictment were a permissible delay.

20

The second fact from which the district court concluded this factor weighed against the Government (not turning over evidence) is discussed, *infra*, as a claim that Frye was actually prejudiced. As will be discussed, taken as true, it is inadequate to conclude, pre-trial, that there has been a speedy trial violation.

The third fact from which the district court concluded that this factor weighed against the Government was that Frye claimed he had not appealed rulings by the magistrate judge because of the death penalty representations. The district court's findings are inadequate to support its conclusion for three reasons. First, there is no finding that Frye actually refrained from such appeals. Second, there is no finding that such appeals would have altered the outcome. Third, there was no finding of a nexus between the alleged misrepresentations, the alleged decision not to appeal, and the speediness of trial. In the absence of such findings, it was clearly erroneous for the district judge to conclude that these facts weighed against the Government.

There is inadequate reason to presume, on the basis of the improperly induced continuances, that Frye will be prejudiced at trial (following this interlocutory appeal). Restated, the continuances caused delay; but, it cannot be presumed that the delay prejudiced (or will prejudice) Frye.

(3)

21

The third of the factors to be evaluated for possible presumed prejudice is the diligence with which Frye asserted his speedy trial right. The district court found that, although there was no speedy trial motion until February 2002, "it [was the court's] recollection ... that the issue was [earlier] raised informally in at least one of the status conferences"; acknowledged the prior waivers by Frye, but declined to enforce them because, in making them, Frye had been "misled by the Government"; and found that the right had been timely asserted.

The Government maintains: the court clearly erred in finding Frye had been misled; therefore, his waivers are valid; and Frye only asserted his right when it could be used to dismiss "the charges". Based on our review of the record, the district court did not clearly err in finding either that Frye's counsel had been misled or that Frye's waiver had, in part, been invalid; but, the Government is correct that the court clearly erred when it found that this factor weighed in Frye's favor for presuming prejudice. Under Frye's theory, but for the misrepresentations, his counsel would have opposed the two continuances and demanded an earlier trial. But, when his counsel determined that Frye had not been given the benefit of his bargain (by the Government's deciding to seek the death penalty), counsel did not claim the speedy trial right in order to obtain a speedy trial, but in order to have the indictment dismissed.

22

*Barker* discussed the ways in which the Sixth Amendment right protects societal interests in general, as well as the defendant in particular. "[T]here is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused". *Barker*, 407 U.S. at 519. For this reason, the amount of time that lapsed before Frye made a formal request based on his speedy trial right cuts against presuming prejudice. More importantly, the form in which Frye raised that right weighs against him in two respects.

First, although the district court found that the "issue was raised informally" before February 2002, it clearly erred in finding, based on this, that Frye had then made the request required of him. The discussion and awareness of the right is not the relevant factor; the relevant factor is when and how a trial request is made to the court.

Second, as noted, Frye did not seek a speedy trial in his February 2002 motions. Rather, he raised the Sixth Amendment right only when he sought a remedy for its claimed violation. "[A]n assertion that charges be dismissed for a speedy trial violation is not a value protected under *Barker*". *Cowart*, 16 F.3d at 647.

c.

Again, because prejudice is not presumed, Frye must show actual prejudice. In that regard, the district court found Frye was prejudiced in three ways: without the continuances, he would

23

have been tried on 7 August 2001, before the Government could obtain permission to seek the death penalty; because of the misrepresentations, Frye had not conducted a mitigation investigation; and during the period of delay, the Government continued its preparation for the DOJ meeting to request permission to seek the penalty while withholding documents from Frye, instructing witnesses not to talk to his counsel, and misleading counsel into not preparing a mitigation case.

As noted, **Barker** identified three interests protected by the speedy trial right:  "to prevent oppressive pretrial incarceration"; "to minimize anxiety and concern of the accused"; and "to limit the possibility that the defense will be impaired". 407 U.S. at 532.  The district court found prejudice only with respect to the third interest — impairment of Frye's defense. Frye, however, now urges prejudice based on the other two interests as well.  We decline to address them; the district court did not make findings with respect to them because they were *not* raised there.  (Acknowledging this, Frye claims the prejudice is "self-evident" and "obvious".)

Again, it is easier for a defendant to show post-trial that he was prejudiced to the extent necessary for a speedy trial violation than to do so pre-trial.  *See* **Loud Hawk**, 474 U.S. at 315 ("*possibility* of prejudice is not sufficient to support [defendants'] position that their speedy trial rights were

24

violated" (emphasis added)); *MacDonald*, 435 U.S. at 858 ("Before trial, of course, an estimate of the degree to which delay has impaired an adequate defense tends to be speculative."). Based in part on *MacDonald* (concerning Sixth Amendment), we stated the following in *United States v. Crouch*, 84 F.3d 1497, 1516 (5th Cir. 1996) (en banc) (concerning Fifth Amendment pre-indictment delay), *cert. denied*, 519 U.S. 1076 (1997): "Necessarily, then, a far stronger showing is required to establish the requisite actual, substantial prejudice pretrial than would be required after trial and conviction".

(1)

The Government contends that the first prejudice finding by the district court (trial would have taken place in August 2001 before Government could obtain permission to seek death penalty) is speculative and against the procedures provided in the United States Attorneys' Manual (Manual). We agree that the court clearly erred in this finding. (Accordingly, we need not review the fact finding that Frye could have reached trial on 7 August 2001, although we note, *inter alia*, numerous then-pending motions. Moreover, earlier in its opinion, the district court stated that it "[could not] say whether it would have denied the [pre-7 August] motion[] for continuance[] had Frye objected to, or not joined in, [it]".) It is premature, at best, to find Frye has been prejudiced by the fact that trial did not commence on 7 August 2001.

25

The Government contends correctly that the second finding of prejudice (no mitigation investigation because of misrepresentations) is irrelevant to this speedy trial analysis. An *earlier trial date* would not have given Frye any more of an opportunity for a mitigation investigation than he has had in this case.

In that regard, the district court did not find Frye was prejudiced because the Government is seeking the death penalty. Instead, it found Frye was prejudiced because his attorneys had not undertaken the mitigation investigation. The resulting prejudice found was primarily because they were, therefore, unable to present mitigation material in December 2001 to the DOJ Committee advising the Attorney General on his death penalty decision. (It was the opportunity to present the material, not the outcome of the presentation.) That Committee functions under procedures provided in the Manual.

> Each of the documents provided in support of a recommendation to seek the death penalty and any submissions by defense counsel, shall be reviewed by a Committee appointed by the Attorney General. Counsel for the defendant shall be provided an opportunity to present to the Committee reasons why the death penalty should not be sought.

UNITED STATES ATTORNEYS' MANUAL § 9-10.050. For purposes of the issue at hand, a latter part of that section provides:

26

> *Subsequent to the initial Department of Justice review*, the United States Attorney and the Attorney General's Committee shall review *any submission* defense counsel chooses to make. After considering the information submitted, the Committee will make a recommendation to the Attorney General concerning the application of the death penalty to the case.

*Id*. (emphasis added).

Neither side addresses this latter part of § 9-10.050, concerning submittals post-initial review. Arguably, this part permits the Committee to consider any material Frye chooses to present, including subsequent to remand of this case to district court. It is true another court has held that, consistent with the disclaimer in the Manual, the protocol found in it does not create enforceable rights. **United States v. Lee**, 274 F.3d 485, 493 (8th Cir. 2001), *cert. denied*, 537 U.S. 1000 (2002). But, because we are attempting, pre-trial, to evaluate prejudice *vel non* to Frye, this latter part may provide him an opportunity to present mitigation material he was not prepared to present in December 2001. Therefore, at this point in time, we cannot conclude he has been prejudiced by his being unable to present it then.

The court also found prejudice because of the delay caused Frye in preparing to defend against the death penalty at trial. As discussed, that opportunity remains, following this appeal. Frye has not shown otherwise.

(3)

27

For the third basis on which the district court found prejudice (discovery abuses during the delay), the Government correctly contends that this does not amount to prejudice relevant to a Sixth Amendment speedy trial analysis. As noted, the Government's continuing preparation during the delay does not constitute prejudice. The district court's finding, therefore, is that the Government's discovery abuses caused it. Even assuming those abuses were prejudicial in some sense, they were not in the sense of timeliness — of delaying trial.

In other words, if a criminal defendant did not obtain or discover certain evidence in time for trial on one date, it is generally most unlikely that the Government would *delay trial* in order to attempt to prevent him from obtaining it in time for trial at a later date. Again, Frye has not shown otherwise.

In sum, the district court clearly erred in finding the requisite actual prejudice. Frye has not made the strong showing required to find, *pre-trial*, that there has been a Sixth Amendment speedy trial violation.

### III.

For the foregoing reasons, the order prohibiting seeking the death penalty is **VACATED**; and this matter is **REMANDED** for further proceedings consistent with this opinion.

*VACATED and REMANDED*

28