Harvey D. ARRANT, Petitioner-Appellant,

v.

Louie L. WAINWRIGHT, Director, Division of Corrections, State of Florida, Respondent-Appellee.

No. 72–2207

**Summary Calendar.***

United States Court of Appeals, Fifth Circuit.

Oct. 24, 1972.

Rehearing Denied Nov. 15, 1972.

---

* Rule 18, 5 Cir.; See Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5 Cir. 1970, 431 F.2d 409, Part I.

James L. Padgett, Orlando, Fla., (Court Appointed), Fla., for petitioner-appellant.

Robert L. Shevin, Atty. Gen., P. A. Pacyna, Asst. Atty. Gen., Tampa, Fla., for respondent-appellee.

Before JOHN R. BROWN, Chief Judge, and GOLDBERG and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

This appeal raises one of the most difficult issues which may arise concerning the Constitution and the criminally accused defendant. Appellant Harvey Arrant was convicted of murder

in the first degree on March 19, 1969, in the Circuit Court of Orange County, Florida, and sentenced to life imprisonment. Appellant now challenges this conviction, urging that his right to a speedy trial under the Sixth Amendment to the United States Constitution was clearly abrogated by the State of Florida. After a careful study of the record in this case, this court is compelled to agree.

## I.

This case is before this court on appeal from the denial of a petition for a writ of habeas corpus by the United States District Court for the Middle District of Florida. Appellant had previously sought to press his claim of denial of a speedy trial in the Florida courts. Relief was denied. Arrant v. State, 234 So.2d 167 (4th DCA Fla., 1970). After exhausting all state remedies, appellant turned to the federal courts.

## II.

In the recent case of Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) a unanimous Supreme Court, speaking through Mr. Justice Powell, sought to set out the criteria by which the speedy trial right was to be judged. The court recognized the great difficulty in adjudicating the claim of denial of a speedy trial and pointed out the need for balancing the competing interests involved through a detailed functional anaylsis of the factual situation. In attempting to provide guidelines, the court stated:

A balancing test necessarily compels courts to approach speedy-trial cases on an *ad hoc* basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and preju-

dice to the defendant. 407 U.S. at 530, 92 S.Ct. at 2192.

Our discussion of the merits of appellant's claim will be organized around these suggested categories. Specific factual matters will be more relevant when discussed with the element on which they bear. At the outset, however, it is necessary to have a general overview of the facts, including the circumstances giving rise to the murder charge.

On March 30, 1967, an Orange County grand jury indicted appellant for the murder of one Kenneth Benson. On January 11, 1967, apellant, Mary Peak (a/k/a Mary Peak Arrant), Donald Edwards, and Joe Padgett arrived in Orlando and rented a room at the Log Cabin Motel. The testimony indicates that the group intended to lure someone with money into a card game.

Late that evening, appellant, Mary Peak, and Donald Edwards left the motel and went to a local eating place. They entered separately, with appellant and Edwards sitting together. The murder victim, Kenneth Benson, later joined Mary Peak. According to testimony, appellant and Edwards followed Peak and Benson to another restaurant and left when they left.

Testimony shows that appellant, Peak, Edwards, and Padgett left the motel around 2:00 A.M. on January 12, 1967. Around 2 o'clock that afternoon, Benson's body was found in his car on a lane near the motel. Time of death was fixed at about 1:00 that morning.

Around the end of January, 1967, Donald Edwards was seriously wounded in a gun battle unrelated to this case. He died after some 83 days of hospitalization.

On February 24, 1967, Mary Peak gave a sworn statement to Orange County officers implicating appellant and Edwards in Benson's death. Appellant was indicted on March 30, 1967. Mary Peak testified before the grand jury, allegedly again incriminating appellant and Edwards, but there is apparently no compe-

tent record evidence of her testimony. On April 13, 1967, Mary Peak gave a sworn statement to appellant's attorney which exonerated appellant in the death of Benson. On May 1, 1967, Mary Peak gave sworn testimony again exonerating appellant at a habeas corpus hearing following which appellant was released on $2500 bond.

Trial was set for May 8, 1967. On May 3, 1967, the state was granted the first of several continuances. Appellant was finally brought to trial, after several demands and some questionable maneuvers by the state, on March 17, 1969.

## III.

### *Length of the Delay*

■■ The length of the delay is primarily a "triggering mechanism" for a full inquiry into circumstances giving rise to the speedy trial claim. Barker v. Wingo, supra. The almost two-year gap from indictment until trial in this case is clearly sufficient to require serious consideration of appellant's claim. We now turn to the other elements involved.

### *Reasons Asserted for the Delay*

As noted, on May 3, 1967, the state was granted a continuance in this case following its assertion of the need for more time due to the inconsistent statements of Mary Peak. There was apparently no objection by appellant and trial was reset for June 12, 1967. On June 1, 1967, the state requested another continuance, citing the death of Donald Edwards and the change in Mary Peak's testimony. Again there was apparently no objection and the trial was reset for October 16, 1967. The record and briefs are not clear as to exactly what transpired on that date but appellant, though present and allegedly ready to defend, was definitely not tried. The record does not contain an order granting a continuance or setting a new trial date. It is apparent, however, that the state

was granted another continuance, with no reason therefor established by the record. No new trial date was set.

Beginning in January, 1968, appellant filed a series of four petitions demanding a trial. Apparently no action whatsoever was promptly taken on these requests. Finally, in November, 1968, petitioner's appointed attorney petitioned the court for release and payment. At the time this petition was granted, the court apparently did not directly consider appellant's request for dismissal for lack of a speedy trial. In its order dismissing the appointed attorney, however, the state court noted that the appellant had made application for a speedy trial and that

> the State of Florida by and through Arthur L. Steed, State Attorney for the Ninth Judicial Circuit, has announced that *the State would be unable to successfully prosecute the defendant at the present time or in the reasonable foreseeable future . . .* (emphasis supplied).

Despite this statement, and despite the fact that appellant's attorney was discharged, the indictment against appellant was not dismissed nor was any trial date set for him.

Finally, following the election of a new state attorney, a trial date was requested by the state on January 19, 1969, and trial was set for March 17, 1969.

■ In assessing the reasons asserted for the delay, it seems clear that the alleged change in the testimony of Mary Peak would be sufficient to justify some reasonable delay in the trial so that the state could further investigate the situation and possibly prepare a case for her impeachment. This, however, begins to seriously weaken as a justification after the October, 1967, trial was postponed. The state cannot use this sole excuse to indefinitely postpone trial.[1]

---

1. Furthermore, this court wonders at the strength of this ground in light of the testimony of the new state attorney who

tried the case at the *habeas* hearing below in the district court. In response to a question from the district court as

■ The death of the possible witness participant Donald Edwards is not very convincing as a justification for the lengthy delay. He was not available before the grand jury which indicted appellant nor is there any evidence that the state had reasonable expectation that it would in any way benefit from testimony he might give.

■ Therefore, it seems that little if anything was left of either of these asserted justifications after the October trial was aborted. What reason is then to be assigned to the almost fifteen-month delay from this time until a trial date was even requested by the state? The obvious answer is, remarkably, the one given by the state at the hearing below. The state attorney who handled this case quite candidly stated to the district court under oath that he kept putting off trial because he "did not want to see him [appellant] be acquitted of this crime". Thus, this is the only viable excuse for the delay that this court will accept for the period after October 16, 1967. Needless to say, this court finds this asserted justification extremely unsatisfactory and will weigh this element heavily in the ultimate determination of appellant's claim.

### Defendant's Assertion of the Right

As previously noted, appellant first made a demand to be tried on January 5, 1968. Other motions to the same effect were filed on February 6, 1968, and March 7, 1968. The record does not show any response at all from either the state or the court to these demands. Again on October 1, 1968, appellant filed another demand. This, too, was never directly addressed, although there was apparently some consideration of the speedy trial claim at the hearing in November, 1968, as previously discussed.

to how, in light of the continuances for lack of evidence, the case was finally proved, the state attorney stated: "Judge, we proved it by bringing in every single shred and scrap of circumstances we could. We proved this case beyond any reasonable doubt without the testimony of Mary Peak".

In Barker v. Wingo, supra, the Supreme Court treated fully the importance which attaches to an accused's demands for a speedy trial. It also went deeply into the question of waiver of the right. We find the arguments for waiver made in this case by the state to be totally unconvincing. Contrary to the state's claim, the appellant here was not "continually waiving his rights". Appellant began to demand trial within ten months of his indictment and within three months of the last trial date which had been set for his case. After the first continuances, there was really no need to make a demand since the trial judge undertook to set a new date for trial in the relatively near future.[2] However, after the continuance *sine die* in October, and after no date for trial was set soon thereafter, appellant quickly began active assertion of his right to a speedy trial. We find this to be a most timely and reasonable exercise of the demand right. The appellant repeatedly put the state on notice that he desired to be tried, beginning over a year before the state ever requested a trial date.

■ While timely demand is an important element, we feel that the response of the state to such demands is also a matter of prime importance. Here the record shows only silence, or at worse, deliberate inattention, by both the court and the state to appellant's repeated demands. As noted, the only response finally given by the state at the November 1968 hearing was to the effect that it might well never be ready to try appellant.

At this point, appellant has presented a strong prima facie case that his Sixth Amendment right to a speedy trial was violated by the State of Florida. One last element remains to be considered.

2. The record is not clear as to what arguments of counsel were presented at the early continuance hearings. Even if appellant did not object to the continuances, we do not find that of great significance at these early stages, especially since the state had clearly reasonable justification for the first two.

### Prejudice from the Delay

■ The last element to be weighed in the balance is the impact which the otherwise unjustified delay may have had on appellant and the defense of his case. In *Barker*, the Supreme Court recognized essentially three subcategories of prejudice against defendants which could arise from the denial of a speedy trial: (i) oppressive pretrial incarceration; (ii) anxiety and concern of the accused; (iii) impairment of the defense.

The record in this case demonstrates that appellant was incarcerated for only a short time. Following the *habeas corpus* proceeding at which Mary Peak testified in his behalf, appellant was released on $2500 bond. Thus, this harm was not present here.

Secondly, there is the problem of anxiety and concern of the accused. This is, of course, present to some degree in virtually every case. Undoubtedly, it is quite severe in a capital case such as this where, at the time, appellant was faced with the possibility of the death sentence if convicted.

Finally, we come to the most important type of prejudice which must be considered—factors which operate to lessen the accused's ability to present his defense.

In this case, appellant has pointed to loss of memory by Padgett, who was closely connected with the events in question, as working against his interest. Loss or non-loss of memory is a quite difficult thing to establish. It is true that Padgett did claim a loss of memory several times while being examined. Once he was ruled a hostile witness, however, he repeatedly relied on his Fifth Amendment protection against incrimination. Therefore, this court wonders about the degree to which his memory was indeed affected by the passage of time. Under the circumstances of this case, while we recognize the possible substance of this memory-loss argument, we are not inclined to give it great weight.

There is, however, a far more serious allegation of prejudice in this case. As previously noted, Mary Peak had originally given a sworn statement incriminating appellant and Edwards before appellant was arrested. She also allegedly testified to the same effect before the grand jury, although no competent record of this testimony was apparently preserved. Soon thereafter, Mary Peak issued a sworn statement exonerating appellant (on April 13, 1967) and gave sworn testimony exonerating appellant at the hearing on May 1, 1967, which resulted in appellant's release on bond. This inconsistency was, of course, the major justification pressed by state in its requests for continuances.

About two weeks after the new state attorney had requested a trial date for appellant, Mary Peak was subpoenaed to appear before the state attorney. The record does not show any other attempts by the state to discuss the change in story with Mary Peak although the court is willing to assume that sometime earlier during the almost two-year period state officials had contacted her. On the date of this appearance before the state attorney, February 12, 1969, Mary Peak was arrested by state officers and charged with perjury regarding the statement she had given the county solicitor in 1967. She was told that her bond would be set at $50,000, which was *twenty* times the bond on which appellant, charged with murder in the first degree, had been at liberty for almost two years.

After a private conference with the new state attorney, Mary Peak issued a new affidavit which stated that her original statement to the Orange County authorities was correct and that her exonerating statements were not correct. She did not, however, directly incriminate appellant anew in this statement. The state attorney immediately dropped all charges against Mary Peak. There

is also testimony that a state officer offered to help her get a job and would give her a place to stay and have her baby cared for while she worked in exchange for testimony against appellant. Testimony by state officers at the hearing below substantially established the accuracy of these actions by the state.

When called by the state at apellant's trial, Mary Peak, after being provided with counsel, refused to answer all questions, relying on Fifth Amendment rights. The defense, aware of her latest statements to the state attorney, did not call her.

The allegation is clearly that appellant was denied the testimony of an admitted eyewitness to the killing because of the affirmative and highly questionable actions taken by the state attorney during the period that appellant's trial was delayed. It must be remembered that Mary Peak had already once given testimony in court exonerating appellant. In another sworn statement, executed in 1971 after appellant was in prison serving this sentence, Mary Peak again exonerated the appellant, outlined various pressures which she said the prosecution exerted on her, and clearly indicated that she would have testified for appellant had it not been for the actions of the state attorney.

The state asserts that appellant was not prejudiced by the deprivation of this witness at trial. First, the state claims that it could have impeached Mary Peak's testimony through the use of her inconsistent statements. This is definitely not a matter within the state's power to unilaterally decide. From the record of testimony below it is clear that Mary Peak was a strong witness. One state attorney admittedly feared that appellant would have been acquitted before the steps which deprived him of Mary's testimony were taken. While the state seems to rely heavily on this impeachment argument, it is clear that the state was unwilling to proceed against appellant until Mary Peak was completely removed as a possible witness for appellant.

It is appalling to this court for the state to claim that its action which ultimately led to the witness not testifying was harmless since it could have impeached her. Impeachment is a quite tricky exercise. Under our system of criminal justice the ultimate question of credibility is for the jury. Perhaps Mary Peak could have satisfactorily explained the inconsistencies to the jury's satisfaction. Due to the actions of the state, the jury was not given the opportunity to pass on these credibility matters. Had it believed the testimony that Mary Peak would have almost certainly given, appellant would most likely have been acquitted. This is virtually admitted by the state. We shall not sanction unilateral state action which in substance deprives the jury of its right to determine credibility by finding that the deprivation of Mary Peak's testimony was harmless due to a claim of impeaching evidence.

Finally, the state blandly asserts that it was not the delay, but rather the fear of perjury and possible self-incrimination which deprived appellant of the testimony of Mary Peak. This overlooks the activist role taken by the state in causing the deprivation of this testimony. Mary Peak had already once testified in court that appellant was innocent. While all of her statements may have been sworn, this was the only one made in the open before a court of law. We are convinced that under the totality of circumstances in this case, the state took advantage, active advantage, of its own self-generated delay to the detriment of appellant's defense.

We shall not indulge in lengthy speculation as to precisely what role the delay played here. Perhaps Mary Peak's situation had changed so that the procedures used by the state were more effective now than they would have been earlier; perhaps the passage of time and the threat of dismissal under Florida's "three terms of court" rule was what led the state to engage in such drastic tactics; or perhaps it was merely that time allowed for the election of a new prosecu-

**684**

tor who was not reluctant to use practices which raise most serious questions of propriety. In any event, it seems clear that had appellant been brought to trial quickly, without the intimidation later practiced, there was a very great chance that the jury would have found him innocent.

## IV.

Having discussed the various factors which are vital to the determination of whether the appellant has been afforded the requisite speedy trial, we feel that appellant's conviction must be vacated and that he must be released. This is not a step which this court takes lightly. Appellant was charged with a serious offense and the rights of society must be carefully considered. On the other hand, the very serious nature of the charge is another factor for requiring a speedy trial so that the rights of the accused can be fully protected. This appellant was sentenced to spend the rest of his natural life in prison. There is, as previously pointed out, great doubt that, had it not been for the delay and the intervening events, he would have been convicted. This is precisely the precious element of human freedom which the Sixth Amendment was designed to protect.

Throughout the proceedings involved in this case the State of Florida demonstrated a callous disregard for the rights of this appellant. Appellant has been able to satisfy this court that he prevails on each of the factors which Barker v. Wingo throws into the balance. We are especially concerned that after a reasonable time had passed the state did not answer his demands or attempt to justify the continued delay. This court fears the day when any arm of our government is allowed to keep an individual under indictment for an extended period merely because it fears that were he brought to trial, he would be found not guilty.

Reversed and remanded with directions.