United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 6, 2007**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

—————————

No. 05-60406
—————————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JAMES E. FRYE,

Defendant - Appellant.

Appeals from the United States District Court
For the Southern District of Mississippi

Before KING, GARZA, and PRADO, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

James E. Frye, Jr. ("Frye") was convicted of conspiracy, 18 U.S.C. § 371, carjacking resulting in death and aiding and abetting in the same, 18 U.S.C. §§ 2 and 2119(3), use of a firearm in relation to a crime of violence, 18 U.S.C. § 924(c)(1), and interstate transportation of a stolen vehicle, 18 U.S.C. § 2312. On appeal, he challenges the sufficiency of the evidence as it relates to the carjacking and firearm counts, the district court's finding that his Sixth Amendment right to a speedy trial has not been violated, the district court's finding that his due process rights were not violated when the

prosecution used inconsistent theories of the facts, and the constitutionality of the federal government's ability to criminalize carjacking.

I

The offenses in question stem from a double murder and robbery, which occurred on April 13, 1999, in Jasper County, Mississippi. The victims were Willie Hatten III ("Hatten") and Lottie Marshall ("Marshall"). Frye's co-conspirator, Billy D. Cooper ("Cooper"), had developed a robbery plan that involved luring someone to a remote oil field under the guise of selling him drugs. After arranging the meeting with Hatten in an oil field, Cooper called Frye and asked for Frye's help. Cooper told Frye that he "couldn't be squeamish" and "couldn't have no weak conscience." Frye agreed to participate.

Later that evening, while Frye waited in a car at the oil field, Cooper and Hatten arrived in separate cars. Unbeknownst to Frye or Cooper, Hatten was driving Marshall's car, and Marshall was in the car with him. Frye stated that Cooper and Hatten got out of their respective vehicles and were negotiating a drug deal when Cooper took out his gun and shot Hatten. Frye got out of his car and noticed Marshall sitting the car attempting to move from the passenger's seat to the driver's seat. Frye notified Cooper that Marshall was present and attempting to get in the driver's seat. Cooper went over to the car and forced Marshall out if it. Frye stated that at this point Hatten was still alive, so Cooper made Marshall help them move Hatten to some nearby bushes, where Cooper shot Hatten again) ) this time killing him.

Cooper and Frye got in Marshall's car and made Marshall get in the trunk. They drove to a car wash to clean off some of the blood, and then drove back to the scene of the murder, where Cooper forced Marshall to help them move Hatten's body to another location. Frye stated that while

they were moving Hatten's body, Cooper shot Marshall. At trial, though, the government presented evidence that Frye shot Marshall. According to Mary Denise Dean ("Dean"), who was Cooper's girlfriend and who was housing Frye at the time, Cooper had reservations about killing Marshall and Frye stated to her that he, Frye, could not let Marshall live.

After murdering Hatten and Marshall, Frye and Cooper had three cars at the crime scene: the car Frye had been waiting in, the car Cooper arrived in, and Marshall's car, which she and Hatten had arrived in. Frye and Cooper first dropped off Cooper's car at a location in Laurel, Mississippi, then returned to the crime scene to pick up Marshall's car. After picking up Dean, the three drove to New Orleans in two cars, with Frye driving Marshall's car and Dean and Cooper in the other car. In New Orleans, they set fire to and abandoned Marshall's car. On the way back to Laurel, they were stopped by a Mississippi State Trooper and Cooper was cited for speeding.

Prior to the murders, Cooper had paid $400 to his nephew, Leonard Demond Newell ("Newell"), who lived near the oil field, to dig a hole there. Newell testified that Frye was present during a portion of the digging. He also testified that while he and Cooper were digging the hole, a passerby inquired about the purpose of the hole. Cooper stated that they had a sick cow. After the murders at the oil field, Frye and Cooper covered the bodies with dirt in the hole they had previously dug. Cooper, though, was concerned about the passerby observing Cooper and Newell digging the hole. So a couple of weeks after Cooper had paid Newell to dig the first hole, he paid Newell $500 to dig a second hole about a mile and half from the first. Then, not long after that, Frye appeared at Newell's house and told him that Cooper wanted them to dig up the first hole. Frye and Newell were digging together until they hit the leg of one of the victims, at which point Newell stated he became squeamish. Frye continued digging until the bodies were completely exposed; he wrapped them in

blankets, moved them to the back of Newell's truck, and Frye and Newell drove to the location of the second hole. Before re-burying the bodies, though, the victims' hands were severed as was Hatten's head. These body parts were placed in a garbage bag, which was briefly kept at Dean's house before they were disposed of elsewhere.

On July 13, 1999, Frye was arrested on unrelated charges. When asked about the missing persons report on Hatten and Marshall, Frye said that he and Cooper were supposed to be involved in a drug deal with Hatten and indicated that some people from New Orleans might have been responsible for the murder. Frye was released on bail but arrested again on August 17, 1999, again on unrelated charges. This time Frye confessed that he and Cooper had been involved in the incident that lead to the death of Hatten and Marshall.

Based on Frye's confession and corroborating evidence, Frye and Cooper were arrested and indicted by local police. But the federal government took over the case when the state expressed that it did not have the funds to perform a capital investigation and prosecution. In February 2001, Frye was indicted on federal charges.

During the course of the pre-trial preparation, Frye complained that numerous misrepresentations made by the prosecutors led to delays in bringing his case to trial. On May 20, 2002, the district court granted Frye's motion to dismiss the death penalty on the basis of speedy trial violations. The government, through an interlocutory appeal, challenged the district court's ruling. While affirming the district court's finding that misrepresentations had been made, this court reversed the district court and held that Frye had established neither a presumption of prejudice nor actual prejudice needed to sustain a speedy trial claim. *United States v. Frye*, 372 F.3d 729 (5th Cir. 2004). We remanded the case back to the district court on July 23, 2004, when the mandate issued on our

opinion.

On August 26, 2004, the government filed a superseding indictment. The new indictment was filed to comply with the Supreme Court's requirement that those aggravating factors that elevate the offense to a capital offense be charged in the indictment. *See Ring v. Arizona*, 536 U.S. 584 (2002). *Ring* was decided on June 24, 2002, which was after the government filed its notice of appeal on June 18, 2002. Frye was arraigned on September 9, 2004. After status conferences, continuances, and hearings on motions to suppress, the jury selection lasted from January 18 to January 25, 2005. The guilt phase lasted from January 31 to February 3, 2005, and the penalty phase lasted from February 7 to February 10, 2005. Although the jury found Frye guilty on all four counts, it declined to impose the death penalty. Instead, Frye was sentenced to life imprisonment for carjacking resulting in death, 37 months imprisonment for conspiracy and interstate transportation of a stolen vehicle, and 60 months imprisonment for use of a firearm during a crime of violence.

## II

### A

Frye first argues that there was insufficient evidence to convict him of carjacking resulting in death and use of a firearm during a crime of violence. By moving for a judgment of acquittal at the close of the government's case in chief and at the close of evidence, Frye has preserved the *de novo* standard of review on these claims. *United States v. Harris*, 420 F.3d 467, 470 (5th Cir. 2005). Therefore, we "'determine whether . . . a rational jury could have found the essential elements of the offense beyond a reasonable doubt.' We are concerned only with 'whether the jury made a rational decision, not with whether its verdict was correct on the issue of guilt or innocence.'" *United States v. Alarcon*, 261 F.3d 416, 421 (5th Cir. 2001) (internal citations omitted). We review "the evidence

and the reasonable inferences which flow therefrom in the light most favorable to the verdict."
*United States v. Jones*, 185 F.3d 459, 464 (5th Cir. 1999).

Frye's challenges are very narrow. First, he challenges the sufficiency of the evidence used to support the intent requirement for the carjacking offense. Second, he argues that because he could not have been convicted of carjacking, and because carjacking was the predicate crime of violence, therefore he cannot be convicted for use of a firearm during a crime of violence. Because Frye's challenge to the firearm conviction turns entirely on whether there is sufficient evidence to support the carjacking conviction, we will focus only on that count.

Carjacking resulting in death falls under 18 U.S.C. § 2119(3), which states,

> Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall, . . . if death results, be fined under this title or imprisoned for any number of years up to life, or both, or sentenced to death.

The only element Frye challenges is the intent requirement.[1] To satisfy the intent requirement, the government must present enough evidence to allow a rational jury to find "a nexus between the intent to kill or harm and the taking of the car at the precise moment of either the taking of the car or the threat to do so." *Harris*, 420 F.3d at 475. In *Holloway v. United States*, 526 U.S. 1 (1999), the Supreme Court interpreted the intent requirement of § 2119(3) as a conditional intent. *Id.* at 12. For the government to establish a conditional intent to kill or harm, it need only establish that defendant was willing to kill or harm the driver if the driver did not comply with the demand to turn over the car. *Id.* In a case such as this one, where the driver, Marshall, surrendered her vehicle at the time it

---

[1] Although Frye was convicted of carjacking and aiding and abetting the same, and the jury was given aiding and abetting instructions on the carjacking count, neither party argues the relevance of the aiding and abetting charge to this analysis.

was demanded, the government need only "prove beyond a reasonable doubt that the defendant[s] would have at least attempted to seriously harm or kill the driver if that action had been necessary to complete the taking of the car." *Id.*

Because Marshall complied with the demand for the car, we must rely on the circumstances of the taking to determine what Cooper and Frye may have done had she not complied. The circumstances clearly allow a rational jury to find that Cooper and Frye would have attempted to seriously harm or kill Marshall. Immediately before taking control of Marshall and her vehicle, Cooper shot Hatten a number of times. Frye alerted Cooper of Marshall's presence and her attempt to get in the driver's seat of her car. A rational jury was free to believe that Frye and Cooper wanted to take control of vehicle to prevent Marshall from escaping and informing the police of what she had just witnessed. A rational jury could conclude that had Cooper and Frye been unable to gain Marshall's compliance through threats, then they would have been willing to use extreme violence.

The facts of this case are in stark contrast to those of *Harris*, where this court found the evidence was insufficient to establish the required nexus between the intent to kill and the taking of the car. *Harris*, 420 F.3d at 475. In *Harris*, the government was unable to present any evidence at all as to the circumstances under which the defendant took control of the vehicle; therefore the jury was not provided with a basis upon which to determine the defendant's mind set at the time he took the victim's vehicle. *Id.* In this case, the circumstances surrounding the taking of the vehicle indicate a sufficient basis for the jury to determine that Cooper and Frye were willing to use physical violence.

Frye also argues that his intent was not to take the car for the car, but rather "the only reason the car was taken was [to] keep it from leading authorities to the scene of the homicides." This fact goes to motive and not to intent. We have clearly stated, "The defendants' motive in taking the car

is irrelevant." *United States v. Harris*, 25 F.3d 1275, 1279 (5th Cir. 1994). Whether Frye and Cooper were planning to sell the car, use it for transportation, or abandon it in New Orleans to mislead authorities by constructing an alternative theory of who killed Hatten and Marshall is not relevant to establishing the elements of the offense. Therefore, Frye's motive does not call into doubt a reasonable jury's ability to find that the government met its burden in demonstrating the statutory elements of the offense.

Because there was sufficient evidence to support the conviction for carjacking resulting in death, Frye's argument challenging the sufficiency of the evidence to support his conviction for use of a firearm during a crime of violence resulting in death, under 18 U.S.C. § 924(c)(1), is also rejected. The only argument Frye offers on this count is that because he did not commit a carjacking, then he did not commit a crime of violence. But because we have found the evidence sufficient to support his carjacking conviction, and because "[c]arjacking is always and without exception a 'crime of violence' as that term is defined in 18 U.S.C. § 924(c)(3)," *United States v. Singleton*, 16 F.3d 1419, 1423 (5th Cir. 1994), Frye's challenge must fail.

B

Next, Frye challenges the district court's denial of his motion to dismiss for Sixth Amendment speedy trial violations.[2] This court reviews Sixth Amendment speedy trail claims under a four-factor balancing test developed by the Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972). "Those factors are: '(1) the length of the delay, (2) the reason for [it], (3) the defendant's diligence in

---

[2] The Sixth Amendment states, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and pubic trial. . . ." U.S. Const. amend. VI. Frye waived his statutory rights under the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.*, for delays prior to the interlocutory appeal and does not raise any statutory claims for delays following the remand.

asserting his Sixth Amendment right, and (4) prejudice to the defendant resulting from the delay.'" *United States v. Hernandez*, 457 F.3d 416, 420 (5th Cir. 2006) (modification in original) (citing *United States v. Cardona*, 302 F.3d 494, 496 (5th Cir. 2002)).

The district court's factual findings in applying the elements of this balancing test are reviewed for clear error. *See United States v. Frye*, 372 F.3d 729, 735 (5th Cir. 2004). Therefore, "'we defer to the findings of the district court unless we are left with a definite and firm conviction that a mistake has been committed.'" *Id.* (internal citation omitted). But "[t]he standard of review for assessing a court's 'four-factors balancing' is unresolved in this Circuit." *Hernandez*, 457 F.3d at 421 (citing *Frye*, 372 F.3d at 735) (suggesting that the standard of review was either *de novo* or clear error). As in the government's interlocutory appeal, we need not resolve this issue now. Even under a *de novo* standard of review) ) the standard most helpful to Frye's present appeal) ) we do not find that Frye's Sixth Amendment speedy trial rights were violated.

The basic framework for applying the *Barker* factors requires that we first consider the length of delay. Only if the delay-length is sufficient to warrant judicial examination of the claim does a court weigh all four *Barker* factors. *Frye*, 372 F.3d at 736. If the delay-length is sufficient, then a court determines whether "the first three *Barker* factors weigh so heavily in favor of the defendant that prejudice is to be presumed." *United States v. Serna-Villarreal*, 352 F.3d 225, 231 (5th Cir. 2003). "If prejudice is presumed, the Government can overcome that by 'showing that the presumption is extenuated . . . or rebutting the presumption with evidence.'" *Frye*, 372 F.3d at 736 (citing *Serna-Villarreal*, 352 F.3d at 231). But if the first three factors do not weigh so heavily as to justify a presumption of prejudice, then the defendant bears the burden of both establishing actual prejudice and demonstrating that such prejudice is sufficient to outweigh the other three factors.

*Serna-Villarreal*, 352 F.3d at 230.

Our consideration of the *Barker* factors in this case is informed by our analysis in the government's interlocutory appeal on this issue. In the interlocutory appeal, we held that the length of the delay was sufficient to warrant judicial examination of the claim. *Frye*, 372 F.3d at 737. We also held that the first three factors))the length of the delay, the reason for the delay, and the defendant's diligence in asserting his Sixth Amendment right))did not weigh so heavily in favor of the defendant as to create a presumption of prejudice. *Id.* at 737-39. Further, Frye was unable to demonstrate the requisite actual prejudice prior to the trial.[3] *Id.* at 739-41. Therefore, on this appeal, we perform a full *Barker* analysis in order to determine whether evidence developed after our remand will either establish a presumption of prejudice or whether Frye can demonstrate actual prejudice sufficient to out weigh the other factors.

The first three factors))length of delay, reasons for delay, and Frye's diligence in asserting his speedy trial rights))do not weigh against the government and therefore do not create a presumption of prejudice. Regarding length of delay, Frye's federal indictment was entered in February 2001 and his trial was not until January 2005, establishing a total delay of 47 months. As stated in our prior opinion, the length of delay will generally not create a presumption of prejudice unless "'the post-indictment delay lasted at least five years.'" *Frye*, 372 F.3d at 737 (citing *Serna-Villarreal*, 352 F.3d at 232). Because the delay lasted less than five years, and because Frye offers no reason to depart from this general rule, we find that the delay-length does not weigh in favor of

---

[3] We did note, however, that because the interlocutory appeal took place prior to trial, "'a far stronger showing is required to establish the requisite actual, substantial prejudice pretrial than would be required after trial and conviction.'" *Frye*, 372 F.3d at 740 (citing *United States v. Crouch*, 84 F.3d 1497, 1516 (5th Cir. 1996)).

establishing a presumption of prejudice.

The second factor is the reason for the delay. On this point, we previously held that the reasons for the delays prior to the interlocutory appeal would not weigh against the government, reversing the district judge's finding to the contrary. *Id.* at 737-38. As a result, we will not presume prejudice based on the reasons for delay given for the period from February 2001 to June 2002. This leaves the delay from June 2002 to January 2005. As the Supreme Court noted in *Barker*, "[D]ifferent weights should be assigned to different reasons." *Barker*, 407 U.S. at 531. Weighed most heavily against the government are "deliberate attempt[s] to delay the trial in order to hamper the defense." *Id.* Other more neutral reasons, such as overcrowded court dockets, are weighed less heavily. Valid reasons, such as tracking down a missing witness, will actually justify the delay and will not be weighed against the government. *Id.*

In this case, most of the delay between June 2002 and January 2005 is justified by the time it took for the interlocutory appeal to run its course. The interlocutory appeal began in June 2002, when the government filed its notice of appeal, and went until July 2004, when the case was remanded.[4] "[A]n interlocutory appeal by the Government ordinarily is a valid reason that justifies delay." *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986). But the government's interlocutory appeal may be weighed against it if the appeal was unreasonable. *Id.* at 315-16. We determine the reasonableness of the appeal by considering "the strength of the Government's position on the appealed issue, the importance of the issue in the posture of the case, and)) in some cases)) the seriousness of the crime." *Id.* at 315. In the interlocutory appeal in this case, the government

___

[4] Five months of the appeal period, February to July, 2003, were a remand to the district court to reconstruct status hearings based on Frye's motion.

-11-

challenged the district court's finding of a speedy trial violation, a violation which the district court found would prevent the government from seeking the death penalty. Further, the government's position was not only strong but prevailing. *See id.* at 316 ("[T]he reversals by the Court of Appeals are prima facie evidence of the reasonableness of the Government's action."). Because it was an important issue on which the government prevailed, we do not find that the government's interlocutory appeal was unreasonable, and, therefore, we do not weigh the period of the interlocutory appeal against the government.

Remaining is the period from July 23, 2004, when the mandate issued on our opinion remanding the case to the district court, to January 31, 2005, when the trial began. On August 3, 2004, the district court held a status conference, during which time the government stated that it would file a superseding indictment on August 26 and the parties agreed to a November trial date. On October 1, 2004 , though, Frye sought and received a continuance because his expert witness was then under federal indictment so Frye needed to obtain and prepare a new expert witness.[5] Following the district court's grant of a continuance to Frye, there were no other delays, although Frye moved for additional continuances three more times, which were denied. Ultimately, jury selection lasted from January 18 to January 28, 2005; the guilt phase lasted from January 31 to February 3; and the penalty phase lasted from February 7 to February 10.

Therefore, most of the time between when the mandate was issued on our prior opinion, July 23, 2004, and the date the trial began, January 31, 2005, is attributed to Frye's request for a continuance. The remainder of the time can be attributed to neutral, court scheduling issues. As a

---

[5] Frye does not claim that the federal government maliciously or in bad faith indicted the expert.

result, the reasons for any delay following remand do not weigh heavily against the government. *See Cowart v. Hargett*, 16 F.3d 642, 647 (5th Cir. 1994) ("Where the state advances valid reasons for the delay, or the delay is attributable to acts of the defendant, this factor is weighed in favor of the state.").

The third factor is Frye's diligence in asserting his speedy trial rights. Rather than arguing that he diligently asserted his right to a speedy trial, though, Frye takes issue with our prior holding in the interlocutory decision that an assertion of speedy trial rights should take the form of seeking a speedy trial rather than the form of a motion to dismiss. *See Frye*, 372 F.3d at 739 ("'An assertion that charges be dismissed for a speedy trial violation is not a value protected under *Barker*.'") (citing *Cowart*, 16 F.3d at 647). To support his argument that a motion to dismiss should count as an assertion of speedy trial rights, Frye points to Supreme Court cases noting that dismissal is the only remedy to a speedy trial violation. *See, e.g.*, *Strunk v. United States*, 412 U.S. 434, 440 (1973) ("In light of the policies which underlie the right to a speedy trial, dismissal must remain, as *Barker* noted, 'the only possible remedy.'") (citing *Barker*, 407 U.S. at 522).

By focusing on the remedy, Frye loses sight of the right. The right, in this case, is the right to a speedy trial. An assertion of that right is a demand for a speedy trial, which will generally be an objection to a continuance or a motion asking to go to trial. At the very least, a defendant's assertion of his speedy trial rights should manifest "his desire to be tried promptly." *United States v. Litton Sys., Inc.*, 722 F.2d 264, 271 (5th Cir. 1984). Frye's repeated motions for dismissal of the capital charge are not an assertion of the right, but are an assertion of the remedy. A motion for dismissal is not evidence that the defendant wants to be tried promptly. *See, e.g.*, *Barker*, 407 U.S. at 534-35 ("More important than the absence of serious prejudice, is the fact that Barker did not want a speedy

-13-

trial. . . . Instead the record strongly suggests that while he hoped to take advantage of the delay in which he had acquiesced, and thereby obtain a dismissal of the charges, he definitely did not want to be tried."). Such is particularly true in this case, where Frye often sought a continuance at the same time he sought a speedy trial dismissal. It can hardly be said that, post-remand, Frye's four motions for continuance, one of which was granted and the other three denied, represent a defendant aggressively asserting his desire to be tried promptly.

Therefore, we reaffirm our prior holding that Frye's motions for dismissal do not amount to an assertion of his speedy trial rights. This applies equally to those motions for dismissal before the interlocutory appeal and after the remand. This third factor will also not be weighed against the government.

Because none of the three factors, either separately or in the aggregate, are weighed heavily against the government, Frye has not shown that he is entitled to a presumption of prejudice. As a result, to prevail on his speedy trial claims he must establish actual prejudice and demonstrate that the prejudice sufficiently outweighs the other factors. The speedy trial right is meant to protect a defendant from three principle types of prejudice: "'prevent oppressive pretrial incarceration'; 'minimize [accused's] anxiety'; and 'limit the possibility [of his] defense [being] impaired.'" *Frye*, 372 F.3d at 736 (modifications in original). The Supreme Court has stated that limiting the defendant's ability to prepare his case is the most serious of the three types of prejudice. *Barker*, 407 U.S. at 532.

Frye argues that his defense was impaired and therefore he suffered actual prejudice because

certain government witnesses allegedly changed their testimonies after the trial of Cooper[6] and following the remand from the interlocutory appeal. To support his argument, Frye relies on *Arrant v. Wainwright*, 468 F.2d 677, 682-84 (5th Cir. 1972), where this court found prejudice when state prosecutors obtained continuances in order to coerce, through charges of perjury, an exculpatory witness into recanting her testimony. But in that case, the speedy trial violation was the continuance sought by the government *for the purpose* of coercing a witness. *Id.* at 683 ("[I]t is clear that the state was unwilling to proceed against appellant until [the exculpatory witness] was completely removed as a possible witness for appellant."). As a result, the defendant in *Arrant* had a substantially stronger case because there was a nexus between the reason for the delay, the delay, and the prejudice, and the reason for the delay weighed heavily against the government. There is no such nexus in this case because the period of delay related to Frye's claims of prejudice was either a valid delay (the interlocutory appeal), a delay attributed to Frye (the continuance following remand), or brief neutral delays (court scheduling following the remand).

Further, the type of prejudice suffered in *Arrant* is materially different from the type of prejudice allegedly suffered here. In *Arrant*, the government's action impaired the defendant's ability to present his defense by essentially making an exculpatory witness unavailable. This is exactly the type of prejudice the Supreme Court was most concerned with in *Barker*. *Barker*, 407 U.S. at 532 ("[T]he inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious."). The exculpatory witness in *Arrant* did not die or disappear, but she was nonetheless made unavailable by the government's threat

---

[6] Cooper was tried and convicted just prior to the government's interlocutory appeal in Frye's case.

of perjury charges, therefore making it more difficult for the defendant to present his defense.  In Frye's case, no witnesses were made unavailable.  And, although Frye claims that some of their testimony changed, Frye was able to adequately prepare his case and defense counsel thoroughly cross-examined those witnesses, highlighting the alleged modifications and probing the possible explanations for those changes.

As for the other types of prejudice)) anxiety and oppressive pretrial incarceration)) neither is sufficient in this case to outweigh the other three *Barker* factors.  The district court found that Frye "had presented evidence to the court that it is a strain on him to be awaiting trial on a death penalty case."  We accept the district court's finding on this issue, but because the length of delay weighed against the government is so minor, and because Frye offered no evidence beyond his own testimony that he suffered anxiety, Frye's anxiety does not justify finding a speedy trial violation.

Finally, Frye's argument that he suffered oppressive pretrial incarceration is conclusory and not supported by evidence specifying harm.  A lengthy pretrial incarceration does not inherently offend a defendant's liberty interests.  *See, e.g.*, *Gray v. King*, 724 F.2d 1199, 1204 (5th Cir. 1984) (finding no oppressive pretrial incarceration where defendant received credit for pretrial incarceration to be applied his sentence).  Frye was ultimately sentenced to life in prison without the possibility of release.  Therefore, Frye, like the defendant in *Gray*, did not suffer any increase in his total time spent in prison as the result of pretrial delays.  Because Frye has not identified anything otherwise oppressive about the pretrial incarceration, Frye cannot establish that the pretrial incarceration created prejudice.

The Supreme Court has stated that none of the four *Barker* factors is either necessary or sufficient to find a speedy trial violation; "[r]ather, they are related factors and must be considered

together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *Barker*, 407 U.S. at 533. In this case, the balancing process weighs in favor of the government. Frye's prejudice was minor, at best, and none of the other three factors weighed heavily against the government. Although the total pretrial delay was lengthy, the delays were for the most part either valid or caused by Frye, and there is no evidence that the government sought delays in bad faith or with the purpose of gaining a tactical advantage. Significantly, there is no evidence that Frye actually wanted to, or attempted to, start the trial sooner rather than later. Therefore, we find no violation of Frye's Sixth Amendment right to a speedy trial.

### III

Frye has two remaining arguments. First, Frye argues that his constitutional due process rights were violated when the government presented inconsistent theories at two criminal trials⁾⁾ namely, at Cooper's trial the government argued that Cooper shot Marshall, and at Frye's trial, the government argued that Frye shot Marshall. We have held, though, "a prosecutor can make inconsistent arguments at the separate trials of codefendants without violating the due process clause." *Beathard v. Johnson*, 177 F.3d 340, 348 (5th Cir. 1999); *see also Nichols v. Scott*, 69 F.3d 1255, 1272 (5th Cir. 1995) ("Two things, however, may be said about the rather amorphous doctrine of judicial estoppel. First, there is no indication in the authorities that it is constitutionally mandated. Second, it has apparently never been applied against the government in a criminal case."). In any event, the inconsistencies were immaterial to the conviction since Frye could have been convicted for the same offense, carjacking resulting in death and aiding and abetting in the same, under both theories. *See United States v. Paul*, 217 F.3d 989, 998-99 (8th Cir. 2000) ("When it cannot be

-17-

determined which of two defendants' guns caused a fatal wound and either defendant could have been convicted under either theory, the prosecution's argument at both trials that the defendant on trial pulled the trigger is not factually inconsistent."); *cf. Bradshaw v. Stumpf*, 545 U.S. 175, 187 (2005) (upholding a guilty plea where the defendant's assertions of inconsistency related entirely to which individual shot the victim but where "the precise identity of the triggerman was immaterial to [defendant]'s conviction for aggravated murder.").

Frye's last argument is that the carjacking statute, 18 U.S.C. § 2119, unconstitutionally extends beyond Congress's Commerce Clause authority. Frye admits that this argument is foreclosed by precedent and raises it now only to preserve it for appeal. *See United States v. Jiminez*, 323 F.3d 320, 322 (5th Cir. 2003) ("'In enacting § 2119, Congress could thus rationally believe that carjacking had a substantial effect on interstate commerce and that this national problem required action by the federal government.'") (citing *United States v. Coleman*, 78 F.3d 154, 159 (5th Cir. 1996)).

IV

For the foregoing reasons, we AFFIRM the decisions of the district court.