**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2904-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

CALIER SAMAD, a/k/a
CALIER JOHNSON,

      Defendant-Appellant.

_____

Argued April 14, 2021 – Decided December 3, 2021

Before Judges Ostrer, Accurso and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 14-11-1339.

Michael Denny, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Michael Denny, of counsel and on the brief).

Steven Cuttonaro, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Steven Cuttonaro, of counsel and on the briefs).

Appellant filed a pro se supplemental brief.

The opinion of the court was delivered by

OSTRER, P.J.A.D.

A jury convicted defendant Calier Samad of robbery, felony murder, aggravated arson, and possession of a weapon for an unlawful purpose. The trial occurred over four-and-a-half years after Samad's arrest. The main issue on appeal is whether the indictment should be dismissed and Samad's aggregate seventy-five-year sentence should be vacated, because the delay deprived Samad of his constitutional right to a speedy trial. We are constrained to remand so the court may in the first instance address the factors under Barker v. Wingo, 407 U.S. 514 (1972), in light of a full record.

I.

The evidence against Samad came largely from his codefendant, Joeryan Foreman. Foreman had previously pleaded guilty to first-degree robbery and promised to provide truthful testimony against Samad; in return, the State recommended a fifteen-year sentence. Foreman testified that one January afternoon while he was walking to buy marijuana, he accepted a ride from Samad. Foreman called a seller Samad suggested. Then they all met in South Trenton. Samad pulled up next to the seller's car, and Foreman got in to

complete the purchase. While the seller, Chevin Burgess, was searching for change, Samad opened Burgess's door and pointed a gun at his head. Samad said, "Don't move." Foreman first testified that Samad was speaking to him; but he later said Samad directed his command to Burgess. Foreman testified that he believed Samad intended to rob Burgess. But without taking anything, Samad fired one shot, killing Burgess.

Samad then took control of Burgess's car and ordered Foreman to follow him in Samad's car. They dropped Burgess's car on a dead-end street in North Trenton. Then they purchased a container of gasoline and returned to Burgess's car, and, at Samad's direction, Foreman set fire to it with Burgess inside.

The initial investigation ran cold, but police got a breakthrough after obtaining Burgess's cell phone records. An investigating officer testified that police discovered multiple calls between Burgess and an unusual cell phone number shortly before the fire was reported. They also discovered, contrary to previous reports, that Foreman obtained treatment for burns at a local hospital the night of the homicide. The number he gave the hospital matched the one in Burgess's phone records. Cell tower information indicated that Burgess and Foreman last spoke in South Trenton. The investigating officer also testified a

3

named informant supplied him with a nickname, "Young Money." Police also had Samad's name, but the officer did not identify the source.[1]

Police arrested Foreman on April 11, 2014 on municipal warrants. After a lengthy custodial interview, Foreman inculpated himself and Samad in the homicide and arson. Foreman had a tattoo with the name, "Young Money."

Police charged Samad four days later. The investigating officer testified that after he provided Samad a Miranda[2] warning, Samad refused to answer questions, saying only, "See you in court."[3] There was no forensic evidence tying Samad to the crime, nor did the State establish any prior relationship between Burgess and Samad. But the officer testified that Samad had lived in the area where Burgess's car was left. Although the State presented the case as

---

[1] In his summation, the assistant prosecutor embellished, without objection, that Samad's name "emerged" after the officer took the informant's formal statement, noting, "Nobody else's name. His name." Cf. State v. Branch, 182 N.J. 338, 349 (2005) (explaining that the hearsay rule bars a police witness from implying "that a non-testifying witness has given the police evidence of the accused's guilt" (quoting State v. Bankston, 63 N.J. 263, 271 (1973))).

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

[3] Defense counsel did not object or seek a curative instruction in response to the comment about Samad's exercise of his right to remain silent. See State v. Muhammad, 182 N.J. 551, 569 (2005) (stating that evidence of a defendant's silence "'at or near' the time of arrest, during official interrogation, or while in police custody" is inadmissible).

a robbery that took a deadly turn, defense counsel elicited from the officer that Burgess was known to be a snitch and certain persons — not Samad — had expressed pleasure that he was killed. The defense also elicited minor inconsistencies between Foreman's initial statement to police and his testimony.[4]

Samad, who had a recent criminal conviction (and an extensive juvenile record), did not testify in his own defense. Nor did he present any witnesses.

The jury considered six counts: first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (a)(2); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) and 2C:2-6; first-degree robbery, N.J.S.A. 2C:15-1 and 2C:2-6; second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) and 2C:2-6; second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); and second-degree aggravated arson, N.J.S.A. 2C:17-1(a)(2) and 2C:2-6. The court instructed the jury on accomplice liability regarding all but the murder and unlawful possession of a handgun counts, and the jury acquitted Samad of those two counts. After merging the robbery and weapon charges into the felony

---

[4] Our record reflects that over two years after his arrest, Foreman provided Samad an affidavit exculpating him, although the jury heard nothing of it, and the affidavit itself is not before us. In a police interview two months before trial, Foreman disavowed the affidavit, stating he gave it to avoid retaliation in jail. A transcript of that interview is before us, although it too was not presented to the jury.

murder charge, the court sentenced Samad to a sixty-five-year term for felony murder, consecutive to a ten-year term for aggravated arson, both subject to the No Early Release Act, N.J.S.A. 2C:43-7.2.

Samad raises the following arguments on appeal in his counseled brief:

POINT I

IT WAS PLAIN ERROR FOR THE COURT TO CHARGE FELONY MURDER AS AN ACCOMPLICE LIABILITY OFFENSE. (Not raised below).

POINT II

SAMAD'S RIGHT TO A SPEEDY TRIAL WAS VIOLATED BY THE OVER-FOUR-YEAR DELAY BETWEEN HIS ARREST AND TRIAL SUCH THAT A REMAND FOR DISMISSAL OF THE INDICTMENT IS REQUIRED.

POINT III

THE SENTENCING COURT ERRED WHEN IT SENTENCED SAMAD BASED ON CONDUCT THE JURY ACQUITTED HIM OF. (Not raised below).

In a pro se supplemental brief, Samad argues:

POINT I

THE TRIAL COURT VIOLATED DEFENDANT['S SIXTH AMENDMENT RIGHT TO A FAIR TRIAL, BY PRESENTING TO THE JURORS UNS[U]PPORTING AND FALSELY CLAIMED

6

ROBBERY CHARGE, WHICH LEAD [sic] TO THE CONVICTION OF FELONY MURDER..

POINT II

THE TRIAL COURT VIOLATED DEFENDANT CALIER SAMAD['S] CONSTITUTIONAL RIGHT TO A FAIR TRIAL.

## II.

The sole issue worthy of extended discussion is Samad's speedy trial claim.

## A.

We begin with the pertinent facts.[5] When officers charged Samad in mid-April 2014, he was already incarcerated for a parole violation. A grand jury indicted Samad and Foreman seven months later.[6] After Samad completed his prior sentence in early August 2016, he was held in lieu of a $1 million bail. Samad appeared in court five times in 2015 and five times in 2016. But the record before us does not disclose what occurred then.

---

[5] Many of the facts are found in counsels' statements, rather than proper certifications or affidavits. See R. 1:6-6. We rely on them because they are undisputed.

[6] Only Samad was charged with first-degree murder. Foreman was charged, along with Samad, on the remaining counts.

On January 13, 2017, the court heard Samad's motion for a bail reduction, which the court denied in February 2017. Also at the January hearing, Samad's counsel evidently (we do not have the transcript) orally requested a trial date. The court reportedly required a formal motion, which counsel filed on May 3, 2017. Invoking his constitutional right to a speedy trial, Samad demanded a prompt trial date. Counsel noted that discovery was complete; no motions were pending in Samad's case; Foreman had recanted; and the State lacked other evidence of guilt. Samad did not ask the court to dismiss the indictment.

Three months later, the State filed its responsive brief. The State did not object to setting a firm trial date, but it asserted that Samad's trial had to follow Foreman's, which the court had recently adjourned.[7] The State had sought to begin Foreman's trial on February 27, 2017 as scheduled, but shortly beforehand, his newly substituted counsel filed a motion to suppress his 2014 statement. The State explained that it "made no secret of its strategy of obtaining either Foreman's cooperation or immunity for his testimony" at Samad's trial. The State did not address Foreman's recantation. The State also argued that Foreman's speedy trial interests "supersede[d]" Samad's, because, unlike

---

[7] We presume the court at some point severed Foreman's case, but the record does not include an order doing so.

A-2904-18

Foreman, Samad was not detained on this case until he completed his prior sentence. The State also contended that the delay in Samad's case was consistent with other homicide cases in the county.

In October 2017, at what evidently started out as a status conference, Samad's counsel reminded the court that the speedy trial motion was still pending. Counsel reiterated the points made in their written submissions. Samad's counsel urged the court to set a trial date, asserting it was unfair to subordinate Samad's interests in a speedy trial to the State's desire to try Foreman first. The State insisted it was permitted to prioritize Foreman's trial, which his suppression motion had delayed. Besides, Foreman had been incarcerated on this case longer than Samad.

The judge said he would not schedule Samad's trial before deciding Foreman's motion. The judge also indicated that cases under the Criminal Justice Reform Act ("CJRA"), N.J.S.A. 2A:162-15 to -26 — that is, cases involving arrests after January 1, 2017 — would take priority. The judge specified, "[T]he problem is the speedy trial cases. And between now and the end of the year . . . we probably have three or four speedy trial cases that I have to try . . . because of this change in the law." He voiced his understanding that he needed to prioritize disposition of CJRA cases.

A-2904-18

On November 9, 2017, the court denied the motion in a written opinion. The court determined Samad's speedy trial right had not been violated. The court adopted the State's contention that, as of the October 2017 hearing, Samad had "only been held on the current charges for approximately 14 months," and that was shorter than Foreman's pre-trial incarceration and "other similarly situated defendants." The court found that the State had not deliberately tried to delay Samad's trial, noting the State's argument that it legitimately sought to try Foreman first, and Foreman had delayed his trial by filing his recent suppression motion. The court acknowledged that Samad had invoked his speedy trial right by filing his May 2017 motion, noting the State's concession that Samad's assertion was timely. The judge also stated that Samad did "not contend that his defense would be or has been impaired by the delay," without commenting on Foreman's recantation. The court referred to the seriousness of the offenses in finding the delay "not unreasonable." The court concluded that it would set a firm trial date "as soon as practically possible," and entered an order the same day.

Less than a week later, Foreman withdrew his motion to suppress, and on March 14, 2018, Foreman entered into his plea agreement. The record does not disclose the reason Foreman withdrew his motion, or the reason for the five-

10

month delay in his entering a plea. We also do not have the transcript of his plea hearing.

The case was then transferred to a third judge for trial. She conferenced the case on November 7, 2018. Then, over four years and seven months after Samad was charged, he went to trial. Jury selection began on November 27, 2018 and continued for three more days. Counsel opened on December 5, 2018. The testimonial portion of the trial took two days. The jury returned its verdict on December 13, 2018.

B

Samad's speedy trial claim is governed by the Barker four-factor balancing test; we consider the "[l]ength of delay, the reason for the delay, the defendant's assertion of his [or her] right, and prejudice to the defendant." 407 U.S. at 530; see State v. Cahill, 213 N.J. 253, 258 (2013) (stating that the Barker test "remains the governing standard to evaluate claims of a denial of the federal and state constitutional right to a speedy trial"). The Barker Court recognized that the balancing test "necessarily compels courts to approach speedy trial cases on an ad hoc basis." 407 U.S. at 530. Our State Supreme Court has observed this "necessarily involves [a] subjective reaction to the balancing of circumstances." State v. Szima, 70 N.J. 196, 201 (1976). When a defendant is denied the

11

constitutional right to a speedy trial, the only remedy is dismissal of the indictment. Strunk v. United States, 412 U.S. 434, 440 (1973).

Applying the "traditional deference given to factual findings of the trial court," see State v. S.S., 229 N.J. 360, 374 (2017), we will not disturb the trial court's predicate factual findings if supported by sufficient credible evidence, see State v. Forchion, 451 N.J. Super. 474, 482 (App. Div. 2017) (applying "a deferential standard of review" to factual findings under the CJRA's speedy trial provisions).

But, given the subjective nature of a speedy trial determination, we also deferentially review the court's assessment and balancing of the Barker factors, see Doggett v. United States, 505 U.S. 647, 652 (1992) (stating "we review trial court determinations of negligence [in delaying a case] with considerable deference"), and we will not disturb the trial court's speedy trial determination "unless clearly erroneous," State v. Merlino, 153 N.J. Super. 12, 17 (App. Div. 1977); see also State v. D.F.W., 468 N.J. Super. 422, 437 (App. Div. 2021) (holding that a deferential standard of review should govern a trial court's discretionary balancing of factors in extending time for trial under the CJRA after a superseding indictment); State v. Fulford, 349 N.J. Super. 183, 195-96

(App. Div. 2002) (applying an abuse of discretion standard of review to a trial court's denial of a speedy trial application).[8]

Of course, we review de novo issues of law. See Forchion, 451 N.J. Super. at 481-82 (reviewing de novo questions of law under the CJRA's speedy trial provisions); see also United States v. Velazquez, 749 F.3d 161, 174 (3d Cir. 2014) (reviewing de novo questions of law pertaining to a constitutional speedy trial claim).

The problem here is the trial court did not decide if trial in November 2018 violated Samad's speedy trial right. Rather, the court addressed Samad's request — a year and a half earlier — for a firm and prompt trial date. Samad does not expressly appeal from the court's order denying that request.[9] And Samad never moved to dismiss the indictment on speedy trial grounds. Thus, we have no trial court decision on the issue directly before us.

---

[8] By contrast, several federal courts review de novo a trial court's application of the Barker test. See United States v. Molina-Solorio, 577 F.3d 300, 304 (5th Cir. 2009) (citing cases from the Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits).

[9] But see R. 3:25-2 (stating "[t]he court shall fix a date for trial" if a defendant who has been in pre-trial custody at least ninety consecutive days after indictment moves for a trial date) (emphasis added).

We do not, however, review Samad's appeal through the plain error lens. As the court in United States v. Oriedo, 498 F.3d 593, 596 (7th Cir. 2007), recognized, the Supreme Court in Barker expressly rejected a rule that a defendant waives the speedy trial right by failing to invoke it. Rather, "[t]he 'better rule is that the defendant's assertion of or failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right.'" Oriedo, 498 F.3d at 596 (quoting Barker, 407 U.S. at 528). The Oriedo court acknowledged other federal decisions applying a plain error analysis when a defendant failed to present the speedy trial claim to the trial court, but the Oriedo court concluded that, at least where the defendant had at some point protested the delays in his or her case, the court would not treat the case "outside the general approach set by the Supreme Court in Barker." Id. at 596 n.2.

Still, the absence of a trial court decision on the issue leaves us with a choice: to apply the Barker factors to the record before us, such as it is; or to remand to the trial court to reconsider the factors in light of an expanded record. In the interests of justice, we opt for the second alternative. We are disinclined to exercise original jurisdiction and decide an issue the trial court has not. See State v. Micelli, 215 N.J. 284, 293 (2013) (stating that appellate courts should

14                                                                                                        A-2904-18

exercise original jurisdiction "only with great frugality" (quoting Tomaino v. Burman, 364 N.J. Super. 224, 234-35 (App. Div. 2003))).  Remanding preserves the trial court's primary role in finding facts, ibid., and in applying its "subjective reaction to the balancing of circumstances," Szima, 70 N.J. at 201.

Remanding under these circumstances is not without precedent.  See, e.g., Gravitt v. United States, 523 F.2d 1211, 1216-17 (5th Cir. 1975) (holding that the trial court's failure to consider prejudice from an identified period of delay required remand for an evidentiary hearing); United States v. Anderson, 621 F.2d 292, 294 (8th Cir. 1980) (in a direct appeal of conviction, remanding for an evidentiary hearing on a speedy trial claim, where "evidence concerning the reason for the delay and the prejudice the delay may have caused [the] appellant [was] lacking"); Tucker v. Wolff, 581 F.2d 235, 238 (9th Cir. 1978) (in an appeal from the denial of a habeas corpus petition, identifying "unresolved factual questions" and remanding the speedy trial claim for an evidentiary hearing); United States v. Stoddart, 574 F.2d 1050, 1054-55 (10th Cir. 1978) (remanding for fact-finding and a decision where the trial court did not apply the Barker balancing test); Goffaux v. State, 721 S.E.2d 635, 637-39 (Ga. Ct. App. 2011) (where the trial court failed to consider key facts, reversing and remanding for reconsideration of the motion to dismiss the indictment on speedy trial grounds).

The remand path will enable the trial court to expand the record on critical facts pertaining to the Barker factors, which may tip the balance one way or the other in this very close case. We review how those missing facts fit into the Barker analysis.

C.

1.

The Supreme Court has described the first factor, the length of delay, as a "triggering mechanism," meaning courts need not reach the other Barker factors until the delay is "presumptively prejudicial." Barker, 407 U.S. at 530. In general, courts will presume the length of delay is prejudicial and conduct a full Barker analysis after one year has passed since the defendant's speedy trial right has attached. Cahill, 213 N.J. at 265-66; see also Doggett, 505 U.S. at 652 n.1. But the length of delay is more than just a triggering mechanism. If the defendant makes the threshold showing, "the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." Doggett, 505 U.S. at 652. "[T]he presumption that pretrial delay has prejudiced the accused intensifies over time." Ibid. Furthermore, "when the delay in concluding a trial is excessively long by any measure, . . . the burden to satisfy the other factors is

16

corresponding diminished." State v. Farrell, 316 N.J. Super. 425, 453 (App. Div. 1999).

Courts also must "consider the length of the delay in light of the nature of the charges and the complexity, or lack thereof, of the proofs required to establish each element of the offense." Cahill, 213 N.J. at 277. Thus, a court is more likely to find a long delay unreasonable when a case is simple than it would if the case were complex or involved many defendants. See ibid.

The period of delay begins with a defendant's pre-indictment arrest. Szima, 70 N.J. at 199-200 (stating "the protection of the Sixth Amendment attaches upon arrest on a criminal charge and need not await indictment or information"). It matters not, for purposes of measuring the delay, that a defendant may be incarcerated on a prior conviction when arrested on a new charge. The Supreme Court rejected the notion that a defendant "already in prison under a lawful sentence is hardly in a position to suffer from 'undue and oppressive incarceration prior to trial.'" Smith v. Hooey, 393 U.S. 374, 378 (1969) (quoting United States v. Ewell, 383 U.S. 116, 120 (1966)). The Court held the "delay in bringing such a person to trial on a pending charge may ultimately result in as much oppression as is suffered by one who is jailed without bail upon an untried charge." Ibid.

17

Thus, the trial court erred when it disregarded the eighteen-month post-arrest period while Samad was serving his prior sentence in denying Samad's speedy trial claim for a prompt trial date. Samad's speedy trial right attached when he was arrested on April 15, 2014, and the delay between arrest and trial exceeded four-and-a-half years.

Because the delay exceeded a year, it is presumptively prejudicial and prompts a full Barker analysis. We may accept the State's contention, albeit unsubstantiated, that Samad's delays were typical of homicide cases in the county.[10] But that does not make a four-year-and-seven-month delay unexceptional. When measured against an objective standard, it is a long delay indeed. See Barker, 407 U.S. at 533 (stating a five-year delay between arrest and trial "was extraordinary").

Furthermore, while homicide cases are always serious, they are not always complex. There is less justification to tolerate delay in a serious case that is not complex, because the public has a strong interest in prompt trial of serious cases, and extra preparation time is not needed in non-complex cases. See H. Richard Uviller, Barker v. Wingo: Speedy Trial Gets a Fast Shuffle, 72 Colum. L. Rev.

---

[10] Notably, when Samad was indicted, the county had the third highest backlog of criminal cases in the State. New Jersey Judiciary Court Management 2 (June 2015), http://www.njcourts.gov/public/assets/stats/cman1506.pdf.

1376, 1383 (1972) ("The prosecution's pretrial preparation may be more arduous in a 'complex' case . . . and it may be more thorough if the defendant faces a long sentence on conviction for a 'serious' crime.  But neither gravity nor complexity in themselves would seem to warrant extended delay."); cf. Barker, 407 U.S. at 531 (stating that "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge").  The trial record here indicates that the police completed most of its investigation before Samad's arrest.  And the State presented its case in just two days.  Thus, the first factor weighs in Samad's favor.

2.

We turn to the reasons for the delay.  Here, especially, the record needs supplementation.

"Once a defendant asserts a violation of his [or her] right to a speedy trial, the government is required to identify the reason for the delay." Cahill, 213 N.J. at 266.  Examining the reasons enables the court to determine "whether the government or the criminal defendant is more to blame for that delay." Doggett, 505 U.S. at 651.

"[D]ifferent weights should be assigned to different reasons." Barker, 407 U.S. at 531.  Thus, a court should weigh "[a] deliberate attempt to delay the trial

19

in order to hamper the defense" heavily against the State. Ibid. Meanwhile, "[a] more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." Ibid.; see also Cahill, 213 N.J. at 266. Furthermore, a delay the State does not explain at all "weighs heavily against" it. See Cahill, 213 N.J. at 274. By contrast, delays attributable to a defendant will be weighed against him or her. Farrell, 320 N.J. Super. at 446.

We note at the outset that the State does not attribute any delay to Samad — whether because of motion practice, continuances, or any other reason. The State mainly attributes the delay in Samad's trial to its efforts — justified efforts, the State argues — to secure Foreman's testimony. We acknowledge that trying to procure a witness's testimony is a valid reason for "appropriate delay." See Barker, 407 U.S. at 531 (stating that "a valid reason, such as a missing witness, should serve to justify appropriate delay"). Prioritizing a codefendant's trial to secure testimony against a defendant may also justify "some delay," but there are limits. Id. at 534.

In Barker, the prosecution delayed trying Barker for a double homicide to first try his codefendant, Silas Manning. Id. at 516. The case against Manning

was stronger than the case against Barker, just as the case against Foreman was stronger than the case against Samad. And the prosecution believed that Barker "could not be convicted unless Manning testified against him," ibid., just as the State evidently believed that Foreman's testimony was essential to convict Samad.

It took over four years and six trials to finally convict Manning of both homicides. Id. at 516-17. Two earlier trials ended in hung juries and two, in which Manning was convicted, were reversed. Ibid. The Supreme Court held:

> Perhaps some delay would have been permissible under ordinary circumstances, so that Manning could be utilized as a witness in Barker's trial, but more than four years was too long a period, particularly since a good part of that period was attributable to the Commonwealth's failure or inability to try Manning under circumstances that comported with due process.
>
> [Id. at 534.]

Our court and others have likewise held that the prosecution may not excessively delay a defendant's trial to secure a witness or to turn a codefendant into a State's witness. See State v. Tsetsekas, 411 N.J. Super. 1, 12-13 (App. Div. 2009) (determining the multiple trial delays resulting from the reoccurring unavailability of the State's witnesses were unjustified under the circumstances); Ruffin v. State, 663 S.E.2d 189, 202 (Ga. 2008) (holding the government's

interest in trying two codefendants together did not justify a more-than-two-year delay of one defendant's trial when he did not cause any pre-trial delay and requested to either be tried immediately or be released pre-trial).

In Arrant v. Wainwright, 468 F.2d 677, 679-80 (5th Cir. 1972), the government attributed the two-year delay in a homicide trial to a witness who originally incriminated the defendant in the crime, but later changed her story and exonerated him. The court held the witness's changed testimony was "sufficient to justify some reasonable delay in the trial so that the [S]tate could further investigate the situation and possibly prepare a case for her impeachment." Id. at 680. However, this reason was not an excuse to "indefinitely postpone trial," especially when the prosecutor admitted "he kept putting off trial because he 'did not want to see [the defendant] be acquitted of this crime.'" Id. at 680-81. The court found the nearly fifteen-month delay the government attributed to the witness's changed testimony was unreasonable and heavily weighed the delay against it. Id. at 681. After considering the other factors, the court concluded the defendant's speedy trial rights were violated and ordered that his conviction be vacated. Id. at 684.

Likewise, in People v. Wiggins, 95 N.E.3d 303, 312-13 (N.Y. 2018), the court, relying on Barker, determined the government's five-year delay of one

defendant's trial for the purpose of obtaining a codefendant's testimony against the defendant was unreasonable.[11]

Measured against the delays in <u>Barker</u>, <u>Arrant</u>, and <u>Wiggins</u>, the four-year-and-seven-month delay in trying Samad would appear to weigh against the State. But the limited record prevents a complete analysis of the reason-for-delay factor. Assuming that prioritizing Foreman's case was a valid reason for "some delay," the State was obliged to explain the reasons for the delays in resolving Foreman's case. While Foreman's suppression motion delayed his trial scheduled for late February 2017, the record is silent on why it took so long even to schedule the trial then. The record does not disclose when discovery was complete; whether motion practice (other than Foreman's suppression motion) contributed to the delay; and what occurred in the numerous status conferences in the case.

Apparently, the case against Foreman was not complex, and the evidence was overwhelming. He confessed, and his confession was corroborated by the

---

[11] In <u>Wiggins</u>, the New York Court of Appeals applied the factors set forth in <u>People v. Taranovich</u>, 335 N.E.2d 303 (N.Y. 1975). <u>Wiggins</u>, 95 N.E.3d at 308. The <u>Taranovich</u> "factors are similar, but not identical, to" the <u>Barker</u> factors. <u>Ibid.</u> Under both standards, however, a court considers the reason for the delay to determine whether the delay was justified under the circumstances. <u>See</u> <u>Barker</u>, 407 U.S. at 530; <u>Taranovich</u>, 335 N.E.2d at 445.

record of phone calls between him and Burgess, and by the medical records of the burns he suffered the night Burgess's remains and his car were incinerated.

The record also does not disclose why Foreman's motion remained pending for most of 2017, while Samad waited on the sidelines. Nor does the record disclose the reasons why Foreman withdrew his motion, why another five months elapsed before he entered his plea in March 2018, and why yet another eight months passed before Samad's case was finally tried. On remand, the court should examine whether Foreman's and Samad's cases were treated with the appropriate "sense of urgency." See Farrell, 320 N.J. Super. at 451.

The record also needs to be supplemented to explore if the trial court actually did prioritize CJRA cases over Samad's, and, if so, the prosecutor's position. As we noted, the judge appeared to indicate that CJRA defendants, who were arrested in 2017, see State v. Robinson, 229 N.J. 44, 55 (2017) (stating CJRA became effective January 1, 2017), L. 2014, c. 31, § 21 (stating CJRA applied to persons arrested after effective date), would go to trial before Samad, who was arrested and indicted in 2014.

It is one thing to delay a trial because of court congestion. It is quite another to make a case idle in traffic while newer cases get to speed along in the

24

express lane. In that circumstance, the delays are a product of design, not the result of unavoidable congestion.

Even if the CJRA's 180-day deadline for bringing a detained defendant to trial was about to expire for some defendants under the new law, there was no immediate risk of dismissal. See N.J.S.A. 2A:162-22(a)(2)(a). And the deadline could be extended if defendants posed "a substantial and unjustifiable risk" to community safety or the criminal justice process that "no appropriate conditions . . . could reasonably address," and the prosecutor did not cause "unreasonable delay" in bringing the case to trial. See D.F.W., 468 N.J. Super. at 433-34 (quoting N.J.S.A. 2A:162-22(a)(2)(a)). If the court did prioritize new cases over Samad's case, and the State agreed with the court's position, the resulting delay in Samad's case should weigh more heavily against the State than delays from run-of-the-mill congestion. Cf. Strunk v. United States, 412 U.S. 434, 436 (1973) (stating that delays due to the court's schedule weigh less heavily against the State than deliberate delays).

In sum, the reasons-for-the-delay factor would appear to weigh against the State, but the record must be supplemented to fully assess this factor and its impact on Samad's speedy trial claim.

3.

The third <u>Barker</u> factor is whether a defendant has asserted the right to a speedy trial. "The defendant's assertion of his [or her] speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." <u>Barker</u>, 407 U.S. at 531-32. By contrast, a defendant who fails to assert his or her speedy trial right will have a difficult time proving a violation of that right. <u>Id.</u> at 532; <u>see also</u> <u>State v. Misurella</u>, 421 N.J. Super. 538, 545-46 (App. Div. 2011).

The frequency, force, and timeliness of a defendant's assertion of his speedy trial right is also relevant. <u>Barker</u>, 407 U.S. at 529. Thus, a court will more heavily weigh this factor in a defendant's favor when the defendant raises speedy trial concerns "frequently and explicitly," <u>see</u> <u>United States v. Black</u>, 918 F.3d 243, 263-64 (2d Cir. 2019), rather than only once and long after the right attached, <u>see, e.g.</u>, <u>Fulford</u>, 349 N.J. Super. at 193, 195 (giving little to no weight in favor of a defendant who did not assert his speedy trial right for twenty-eight months). Also, in the view of some courts, invoking the speedy trial right to demand a trial weighs more in a defendant's favor than a motion for dismissal. <u>See</u> <u>State v. Wasson</u>, 879 P.2d 520, 526 (Haw. 1994); <u>United States v. Frye</u>, 489

26

F.3d 201, 211-12 (5th Cir. 2007). But see Fensterer v. State, 493 A.2d 959, 966 (Del.) (rejecting the distinction), vacated on other grounds, 474 U.S. 15 (1985).

Here, Samad evidently asserted his speedy trial right orally in January 2017, and he filed a formal motion in early May 2017, over three years after arrest. He did not seek dismissal; he sought a firm and prompt trial date. But he did not formally do so before May 2017, nor did he formally renew his speedy trial demand after the court ruled in November 2017. We cannot tell if most or all of that inaction was intentional. "Delay is not an uncommon defense tactic." Barker, 407 U.S. at 521. Foreman reportedly sent his letter exculpating Samad in August 2016; and a formal affidavit followed sometime thereafter. At that point, delay evidently disserved Samad. It is unclear when Foreman recanted his recantation, which may have affected Samad's strategy.

Although the current record does not indicate that Samad formally asserted his speedy trial right at any other time, he may have done so informally, at one or more status conferences. Furthermore, the record does not disclose whether Samad himself knowingly and affirmatively decided not to invoke his right. A court may "attach a different weight to a situation in which the defendant knowingly fails to object from a situation in which his [or her]

attorney acquiesces in long delay without adequately informing his client." Id. at 529.

In short, an amplified record may shed light on this factor, which could favor the State or Samad.

4.

The fourth Barker factor is prejudice to the defendant. A defendant's speedy trial right is designed to protect three interests: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." Id. at 532. No doubt, Samad suffered the first two kinds of prejudice, because of his extended pretrial incarceration and the attendant uncertainty. But the most serious prejudice is the last one because a defendant's "inability . . . to adequately prepare his [or her] case skews the fairness of the entire system." Ibid. A defendant can establish a speedy trial violation without evidence of prejudice, Cahill, 213 N.J. at 274, but generally only if the other factors weigh heavily enough in the defendant's favor, Farrell, 320 N.J. Super. at 446.

Generally, the defendant bears the burden of demonstrating "actual prejudice." See, e.g., State v. McNamara, 212 N.J. Super. 102, 105-06 (App. Div. 1986) (finding no prejudice when the defendant could not explain how his

defense would have been impaired by the delay); <u>United States v. Duran-Gomez</u>, 984 F.3d 366, 379 (5th Cir. 2020) (stating "[t]he burden is ordinarily on the defendant to demonstrate actual prejudice"), <u>cert. denied</u>, ___ S. Ct. ___ (2021); <u>United States v. Perez-Cubertier</u>, 958 F.3d 81, 92 (1st Cir.) (stating that defendants generally bear the burden to show the delay compromised their ability to defend themselves), <u>cert. denied</u>, 141 S. Ct. 349 (2020).

However, courts may presume prejudice when there is a long pre-trial delay and most or all of it is attributable to the government. <u>See</u> <u>State v. Davis</u>, 131 N.J. Super. 484, 499-501 (App. Div. 1974) (presuming prejudice existed when there was an eleven-year delay attributable to the government, and observing "unreasonable delays are by their nature prejudicial"); <u>see also</u> <u>Doggett</u>, 505 U.S. at 657-58 (presuming prejudice when an eight-and-a-half-year delay was attributable mostly to the government's negligence); <u>Perez-Cubertier</u>, 958 F.3d at 92 (stating that "prejudice may sometimes be presumed '[i]n aggravated cases, involving grossly excessive delay'" (alteration in original) (quoting <u>Rashad v. Walsh</u>, 300 F.3d 27, 34 (1st Cir. 2002))).

However, a decade's delay is not required to presume prejudice. Federal courts have held that a delay comparable or shorter than the one in this case is sufficient. <u>See</u> <u>United States v. Bergfeld</u>, 280 F.3d 486, 491 (5th Cir. 2002)

(presuming prejudice because the government's negligence caused the five-year delay); United States v. Shell, 974 F.2d 1035, 1036 (9th Cir. 1992) (stating that "[f]ive years delay attributable to the government's mishandling of [the defendant's] file . . . creates a strong presumption of prejudice"); United States v. Ferreira, 665 F.3d 701, 706-08 (6th Cir. 2011) (presuming prejudice after a three-year delay because the government was more than simply negligent); United States v. Erenas-Luna, 560 F.3d 772, 774-75, 780 (8th Cir. 2009) (presuming prejudice after a three-year delay between indictment and arraignment caused by the government's "serious negligence," and a four-and-a-half year delay between arrest and trial); United States v. Ingram, 446 F.3d 1332, 1338-40 (11th Cir. 2006) (presuming prejudice after a two-year delay when the government's negligence was "egregious").

Here, the delay exceeded four years and seven months, and that time appears to be attributable to the State or the court. To the extent the record before us discloses the reasons, we cannot attribute the delay to mere negligence. The State's design was to subordinate Samad's interest in a speedy trial to its goal of prosecuting Foreman first. On remand, the court should also explore the

State's position on trying CJRA cases before Samad's. But, based on this record, one may presume Samad suffered prejudice from the extensive delay.[12]

### 5.

Samad has presented a serious claim that he was denied his right to a speedy trial. It warrants a meticulous review based on a full record. We remand to the trial court for that purpose.

### III.

Samad's remaining points in his counseled and pro se briefs challenging his conviction warrant comparatively brief discussion. We limit ourselves to the following remarks.

Samad contends it was plain error for the trial court to charge the jury on accomplice liability on the felony murder charge. He mistakenly relies on our

---

[12] Samad does not attempt to demonstrate actual prejudice to his defense based on this record. Therefore, we need not address here — although the trial court may explore on remand — whether Foreman's disavowal of his recantation during the period of delay constitutes actual prejudice. See Arrant, 468 F.2d at 682-83 (finding prejudice where, during period of delay, prosecution witness who had recanted and exonerated the defendant disavowed her recantation and then refused to answer questions at trial); State v. Bazemore, 549 S.E.2d 426, 428-29 (Ga. Ct. App. 2001) (stating that a defendant suffered prejudice when his girlfriend, a material witness, broke up with him during the delay, had become hostile to him, and could not be located); but see Brown v. State, 285 So. 3d 671, 683 (Miss. Ct. App. 2019) (stating that "changes in a witness's testimony are not necessarily due to the passage of time and do not, by themselves, constitute proof of prejudice due to delay").

broad statement in State v. Jackmon, 305 N.J. Super. 274, 295 (App. Div. 1997), that "[f]elony-murder . . . is not an accomplice liability offense."  However, we are bound by the Supreme Court's subsequent holding in State v. Whitaker, 200 N.J. 444, 461-62 (2009), that a person may be found guilty of felony-murder as an accomplice.  The Court held that "[i]f the State could prove that [the] defendant, acting as an accomplice, intended to aid or abet [his codefendant] in the theft and knew that [his codefendant] was armed with a gun, then [the] defendant too would be guilty of armed robbery and felony murder."  Ibid.  In short, a jury may find that a defendant was an accomplice to felony murder if the defendant was an accomplice to the underlying felony.

There also was no basis in the evidence for the court to sua sponte deliver the non-slayer instruction for felony murder.  See Model Criminal Jury Charges, "Felony Murder — Non-Slayer Participant (N.J.S.A. 2C:11-3(a)(3))" (rev. Mar. 22, 2004).  The State's theory, consistent with Foreman's testimony, was that Samad was the slayer, not a non-slayer.

Samad, in his pro se brief, contends an inaccurate statement in the State's opening prejudiced his defense; Foreman falsely testified in support of the robbery charge; and the trial court erred in denying his motion for acquittal of the robbery charge.

Contrary to the prosecutor's opening statement, Foreman did not testify that Samad said, "Give it up," as he pointed the weapon, which would have been clear evidence of an intent to rob. Rather, Foreman testified that Samad said, "Don't move." So, evidence of robbery was based solely on circumstantial evidence and Foreman's perceptions.

But we reject Samad's argument that the prosecutor's mistaken prediction of Foreman's testimony, to which defense counsel did not object, denied him a fair trial and constitutes plain error.[13] A prosecutor who predicts a witness's detailed testimony "does so at his peril," but not every mistaken prediction requires reversal. State v. Greene, 242 N.J. 530, 548 (2020). The court must examine the probative value of the predicted testimony, the extent to which trial evidence belied the prediction, and other evidence of guilt. In Greene, the Court reversed a conviction because the prosecutor mistakenly predicted the jury would hear that Greene's grandmother told police that Greene confessed to the homicide for which he was charged. The Court highlighted the extremely

_____

[13] Samad argues the prosecutor lacked a good faith basis for his statement, because Foreman recalled hearing "Don't move," not "Give it up," in his October 2018 statement to investigators. But we do not know if Foreman recalled "Give it up" in his 2014 statement; neither side provided it to us. In any event, the prosecutor's subjective good faith is not dispositive. See State v. Greene, 242 N.J. 530, 547, 551 (2020).

prejudicial nature of the alleged confession, noting the State's concession that the grandmother's prior statement was the State's most important piece of evidence. Id. at 552. The Court also noted that the grandmother never testified, and the prosecutor had "implicitly provided" a reason why she would not testify, that is, to avoid hurting her grandson. Id. at 553. Furthermore, the other evidence of guilt was not weighty. Id. at 554-55.

By contrast, the "Give it up" statement — while highly suggestive of robbery — was not as powerful as a confession. More importantly, Foreman testified at trial, where he established clearly that the prosecutor's prediction was wrong. Foreman repeatedly and consistently recalled that Samad said "Don't move," (although he inconsistently testified about whom Samad was addressing). And, in summation, no one mentioned "Give it up." Defense counsel argued that "Don't move" did not suggest a robbery, and the prosecutor insisted it did. Thus, we are not convinced the prosecutor's misstatement was "clearly capable of producing an unjust result," see R. 2:10-2, requiring reversal.[14]

---

[14] We recognize that, unlike in Greene, the trial court did not give a curative instruction directed to the prosecutor's misstatement. However, such an instruction here may only have increased the jury's focus on the mistaken statement. In her final instructions, the judge did remind the jury that the attorneys' remarks were not evidence and should not be treated as evidence.

Also, the court did not err in denying Samad's Rule 3:18-1 motion for acquittal, which we review de novo. See State v. Cruz-Pena, 243 N.J. 342, 348 (2020). Although the evidence of robbery was not overwhelming, a jury could reasonably infer that if the shooter's sole purpose was to kill, he would have fired without warning. Rather, he told a drug dealer who presumably possessed money and drugs to freeze. Foreman indicated that Burgess had his hand in his pocket, which may have prompted the fatal shot. The jury may also have concluded that the apparent lack of preparations for the fatal outcome also belied an intent to kill as opposed to rob. In sum, "[b]ased on the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony," we conclude that "a reasonable jury could find guilt beyond a reasonable doubt." State v. Williams, 218 N.J. 576, 594 (2014).

## IV.

Finally, Samad argues that if his convictions are affirmed, he should be resentenced because the court sentenced him as if he committed first-degree murder, despite the jury's acquittal on that count. As the Court recently held, "[F]undamental fairness prohibits courts from subjecting a defendant to

enhanced sentencing for conduct as to which a jury found that defendant not guilty." State v. Melvin, 248 N.J. 321, 326 (2021).

Samad highlights three statements the sentencing judge made. It suffices to refer to just two. Responding to defense counsel's argument that consecutive sentences were not mandated, the judge stated, "It's something that probably the Legislature couldn't contemplate. Yeah, let's list in there committing a murder and then driving around with a dead body in the car and then having someone else burn the body, so that . . . it would never be identified." (Emphasis added). The judge also stated to Samad, "You did deprive not only the victim's family of the life of their loved one, but you deprived them from being able to see their loved one, to have closure, to be able to mourn them properly."

Quite possibly, the judge had in mind defendant's felony-murder conviction. But we cannot be certain. Therefore, to assure compliance with Melvin, we remand for resentencing (assuming arguendo the trial court denies his speedy trial claim). Also, consistent with the Court's direction in Melvin that a different judge resentence the two defendants in that case, 248 N.J. at 352-53, we direct that Samad be resentenced by a different judge. We do so notwithstanding our confidence that the sentencing judge would adhere to the dictates of the Melvin decision.

To the extent not addressed, Samad's remaining points in his counseled and pro se briefs lack sufficient merit to warrant discussion.  <u>R.</u> 2:11-3(e)(2).

Remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2904-18